Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 17, 2003        Decided June 17, 2003

No. 02-5049

CROW CREEK SIOUX TRIBE
APPELLANT

v.

LES BROWNLEE, ACTING SECRETARY OF THE ARMY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 01cv00076)

*Peter Capossela*, *pro hac vice*, argued the cause for appellant. With him on the briefs was *Marcella Burgess Giles*.

*Hans Walker* was on the brief for *amicus curiae* The Three Affiliated Tribes of the Fort Berthold Reservation on behalf of appellant.

---

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Lisa E. Jones,* Attorney, U.S. Department of Justice, argued the cause for federal appellees. With her on the brief was *Andrew C. Mergen.*

*Mark Barnett,* Attorney General of the State of South Dakota, and *John P. Guhin,* Deputy Attorney General, were on the brief for appellee State of South Dakota.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: Appellant Crow Creek Sioux Tribe (Tribe) appeals from a district court order denying a preliminary injunction of a transfer of lands from the Army Corps of Engineers (Corps) to the State of South Dakota, as required by Title VI of the Water Resources Development Act (WRDA), Pub. L. No. 106–53, 113 Stat. 269 (1999), *as amended by* Pub. L. No. 106–541, § 540, 114 Stat. 2572 (2000). The Tribe claims that this title transfer will eviscerate the Secretary of the Army's ability to enforce federal cultural protection statutes on the transferred lands, thus injuring the Tribe's rights under these statutes. Because the WRDA explicitly provides that these federal statutes continue to apply on the transferred lands, we dismiss the Tribe's challenge for lack of standing.

## I. Background

Throughout the middle of the 20th century, the Corps, in the course of implementing a federal flood control program (known as the Pick–Sloan Missouri River Basin Program), acquired title to large amounts of land along the upper Missouri River in South Dakota. Some of the Pick–Sloan lands originally belonged to the Tribe's reservation. The Corps is charged with administering the Pick–Sloan lands in accord with federal environmental and cultural protection statutes. It is undisputed that the Pick–Sloan lands contain historic artifacts, cultural objects, and burial remains in which the Tribe has specified rights under several such statutes. *See* Native American Graves Protection and Repatriation Act (NAGPRA), 25 U.S.C. § 3001 et seq. (2000) (providing notifi-

cation and inventory procedures pursuant to which Indian cultural objects and burial remains unearthed on federal lands shall be repatriated to the appropriate Indian Tribe); National Historic Preservation Act (NHPA), 16 U.S.C. § 470 et seq. (2000) (providing notification and consultation procedures federal agencies must follow prior to a federal "undertaking" to consider the undertaking's effect on historic properties); Archaeological Resources Protection Act (ARPA), 16 U.S.C. § 470aa et seq. (2000) (providing criteria and procedures pursuant to which a "Federal land manager" may issue excavation permits for federal lands; providing for notification of Indian Tribe if permits may result in harm to Indian cultural or religious site).

In 1999, the WRDA was enacted to restore wildlife habitat destroyed by flooding on the Pick–Sloan lands. Under Title VI of the WRDA, the Corps is instructed to transfer title to portions of the Pick–Sloan lands to the State of South Dakota. WRDA § 605(a). Initially, the Corps was to transfer certain land and "recreation areas" by January 1, 2002. *Id.* § 605(a)(1)(B). All remaining lands were to be transferred "not later than 1 year after the full capitalization" of a trust fund to promote wildlife habitat restoration. *Id.* § 605(e)(2). Important to this case, the WRDA explicitly provides that, "notwithstanding any other provision of law," the aforementioned cultural protection statutes continue to apply to transferred lands. *Id.* § 605(h). Moreover, the WRDA also makes clear that nothing in the Act diminishes or affects "any authority of the Secretary [of the Army], the Secretary of the Interior, or the head of any other federal agency under a law in effect on the date of enactment of this Act, including," among others, the NHPA, ARPA, NAGPRA, and the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. (2000). WRDA § 607(a)(6).

In November 2001, pursuant to NEPA, 42 U.S.C. § 4332(2)(C), the Corps released a final Environmental Impact Statement (EIS) analyzing the environmental and cultural effect of the anticipated transfer of land from the Corps to South Dakota. The EIS considered two alternatives: (1) Land transfer, as required by the WRDA; and (2) No action.

The final EIS concluded that the required land transfer would have minimal adverse impact on environmental quality and no adverse impact on Indian cultural resources and historic properties. Additionally, the EIS included a description of mitigation measures that the State committed to follow to limit or diminish any impacts of the transfer.

At the same time, the Corps reviewed the transfer pursuant to NHPA Section 106, 16 U.S.C. § 470f, which requires a federal agency with jurisdiction over a federally approved "undertaking" to consider the effects of the undertaking on properties included in, or eligible for inclusion in, the National Register of Historic Places, and requires the agency to afford the Advisory Council on Historic Preservation (Advisory Council) and the State Historic Preservation Officer (SHPO) a reasonable opportunity to comment on the undertaking. *See Nat'l Min. Ass'n v. Fowler*, 324 F.3d 752, 755 (D.C. Cir. 2003). After consultation with the Advisory Council and the SHPO, the Corps determined that the title transfer "will not have an effect upon properties eligible for inclusion in the National Register of Historic Places" because the WRDA provides that the Corps retains authority over transferred lands.

In response to several comments from the Advisory Council, the Corps and the State of South Dakota entered into a Memorandum of Agreement (MOA), which explicitly provides for continued federal enforcement of cultural protection statutes on the transferred lands. The MOA states that the Corps "will retain, and will exercise, all authority, jurisdiction, and powers of approval regarding" the NHPA, the NAGPRA, and the ARPA that it held prior to the transfer. In light of the MOA, on December 14, 2001, the Corps made a second finding pursuant to NHPA Section 106, determining that the transfer "does not constitute an undertaking and therefore will not have an effect upon properties eligible for inclusion in the National Register of Historic Places."

On December 21, 2001, the Corps issued a Record of Decision (ROD) providing that the recreation areas would be transferred on January 1, 2002, in accord with WRDA Section

605(a)(1)(B). By this time, the Tribe had filed suit in district court to enjoin the implementation of WRDA's title transfer provisions. In order to allow time for briefing and argument on the transfer issue, the district court, pursuant to agreement of the parties, ordered South Dakota not to accept title to the recreation areas until February 8, 2002. On January 4, 2002, the Tribe amended its complaint to seek a preliminary injunction barring the transfer.

The amended complaint underlying the motion for a preliminary injunction alleges that the WRDA is unconstitutionally vague, and that the title transfer violates NEPA, NHPA, NAGPRA, ARPA, the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (2000), and the WRDA itself. In its motion for a preliminary injunction, the Tribe contends that transfer of the land to South Dakota would irreparably harm the Tribe's interests in cultural artifacts and tribal heritage sites by removing the lands from coverage under the federal cultural protection statutes and by lessening the federal government's ability to enforce these statutes on the transferred lands.

On February 1, 2001, the district court denied the Tribe's request for a preliminary injunction, holding that the proposed title transfer was consistent with the Constitution and federal law. The district court denied the Tribe's motion for a stay pending appeal; we denied the Tribe's motion for emergency injunctive relief. As a result, the Corps transferred title to the recreation areas to South Dakota on February 8, 2002. The Tribe timely filed this appeal.

## II. Analysis

We need not delve into the Tribe's myriad constitutional and statutory claims because the Tribe lacks Article III standing to bring this action in federal court. Article III limits federal courts' jurisdiction to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. Standing is one of the essential prerequisites to jurisdiction under Article III. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). As the Supreme Court explained in *Lujan*, the "irreducible constitutional minimum of standing contains three elements": (1) an

6

"injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) traceability—that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (3) redressability—that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560–61 (internal quotations and citations omitted). The Tribe has utterly failed to establish an "actual or imminent" injury in fact, and thus lacks standing. Accordingly, neither we, nor the district court, have jurisdiction to consider the merits of its case.

We note at the outset that, contrary to the Tribe's suggestion, the Tribe does not have standing merely because it has statutory rights in burial remains and cultural artifacts on the transferred lands, or because it is affected by the Pick–Sloan Program as a whole. Rather, to establish standing, the Tribe must show that the transfer of these lands to South Dakota causes it to suffer some actual or imminent injury.

The Tribe's brief, while not entirely clear, offers two related versions of the injury it claims to suffer from the land transfer. First, the Tribe asserts that even though the WRDA mandates that cultural resource protection statutes (NAGPRA, NHPA, ARPA) continue to apply on the transferred lands, the Secretary will not be able to enforce the cultural protection statutes because those statutes apply only to lands under federal control or jurisdiction. Consequently, the Tribe asserts that it will be less likely to receive prompt repatriation of burial remains and prompt notice of federal undertakings or federally permitted excavations that may affect cultural resources, as required by the statutes. Second, the Tribe contends that transfer of title to South Dakota will make it practically impossible for the Secretary to enforce the cultural protection statutes, particularly because the Secretary did not reserve easements and proprietary rights in the Quitclaim Deeds for the transferred lands. We address these arguments in turn.

The Tribe's first argument is meritless. Of course, the Tribe is correct insofar that the cultural protection statutes, by their own terms, apply only to federal lands or federal undertakings. *See* NAGPRA, 25 U.S.C. § 3002(a) (providing that statute covers cultural items discovered on "Federal lands"); § 3003(a) (providing that "federal agenc[ies]" with "control" over Indian remains shall prepare inventory); NHPA, 16 U.S.C. § 470f (providing that head of "Federal agency" with jurisdiction over any "Federal or federally assisted undertaking" must assess effect of undertaking on historic property and consult the Advisory Council); ARPA, 16 U.S.C. § 470cc(a)-(c) (providing that "federal land manager" [the Secretary] administers excavation permit process for "public lands" and shall notify an Indian tribe if an excavation permit might result in harm to Indian cultural or religious site). The WRDA, however, explicitly provides that the cultural protection laws will continue to apply to the transferred lands:

> Notwithstanding any other provision of law, the following provisions of law shall apply to land transferred under this section:
>
> (1) The [NHPA]. . . .
> (2) The [ARPA]. . . .
> (3) The [NAGPRA]. . . .

WRDA § 605(h). The only fair reading of Section 605(h) is that these cultural protection statutes will apply on the transferred lands notwithstanding the fact that the statutes themselves apply only to federal lands. *See Yankton Sioux Tribe v. United States Army Corps of Eng'rs*, 209 F. Supp. 2d 1008, 1018 (D.S.D. 2002) (holding that NAGPRA applies to lands transferred to South Dakota under WRDA; granting a preliminary injunction against Secretary for alleged NAGPRA violations on these lands). Any other interpretation would render Section 605(h) a nullity. In effect, Section 605(h) amends the portions of the cultural protection statutes that limit the statutes' coverage to federal lands. Or put another way, the transferred lands will be *treated as* federal lands subject to the full force of the cultural protection

statutes. Thus, the transfer effects no legal change that would lessen the protection of the Tribe's cultural heritage under federal law.

Furthermore, the land transfer does not alter or impede the legal authority of the Secretary to enforce the cultural protection statutes. The WRDA plainly states: "Nothing in this title diminishes or affects . . . any authority of the Secretary [of the Army], the Secretary of the Interior, or the head of any other federal agency under a law in effect on the date of enactment of this act, including" the NHPA, the ARPA, and the NAGPRA. § 607(a)(6)(A), (B), (G). Section 607(a), then, erases any doubt that the Secretary lacks legal authority to enforce cultural protection statutes merely because the title to the transferred land is now held by South Dakota. Accordingly, the Tribe's allegation that it will lose the protection of NAGPRA, NHPA, and ARPA is without merit. Legally, nothing changed when the land transfer occurred, and therefore, the Tribe suffered no injury.

That leaves us with the Tribe's second argument—that the Secretary will be practically unable to enforce the cultural protection statutes after the title transfer (1) because federal control over the land will diminish as state control increases, and (2) because the Secretary failed to reserve rights of access under the Quitclaim Deeds to the land. The Tribe's claim that federal enforcement will diminish merely because South Dakota now holds title to the land is purely speculative. As explained above, the cultural protection statutes continue to apply on the transferred lands, and the Secretary retains full enforcement authority thereunder. The Tribe presents no reason to believe that enforcement will diminish; it simply asserts the possibility that the Secretary will be less willing or less able to enforce federal law if the Corps no longer has title to the property. This unsupported conjecture does not constitute injury in fact when the WRDA itself provides that the Secretary will have an ongoing and undiluted enforcement role on the transferred lands. *See Lujan*, 504 U.S. at 560 (stating that injury must be "actual or imminent, not conjectural or hypothetical") (quotations omitted). Moreover, the MOA confirms the Secretary's intention and ability to contin-

ue enforcing federal cultural protection statutes on the transferred lands. *See* MOA, at 2 ("The Corps will retain, and will exercise, all authority, jurisdiction, and powers of approval regarding the [NHPA], the [NAGPRA], and the [ARPA] that it held prior to the mentioned transfer regarding activities that take place . . . within the transferred lands.").

With explicit statutory enforcement authority and a supporting MOA, it is highly questionable that the Secretary needed to reserve legally enforceable rights in the Quitclaim Deeds. In any event, the Secretary did so. *See* Quitclaim Deeds at 3 ("The Grantor reserves access over, across, on, and under the Land hereby conveyed . . . to carry out responsibilities under Section 605(h) of Title VI"). In addition, the title transfer was made "subject to the provisions of Section 605(h) . . . requiring that certain specified federal laws be applicable to the lands after transfer to the State." *Id.* at 4. Thus, the Quitclaim Deeds are no hindrance to the Secretary's ability to enforce cultural protection laws.

Finally, even if the Tribe's predicted harms constituted an injury in fact, any lack of federal enforcement would be traceable not to the challenged land transfer, but rather to the Secretary's failure to fulfill his continuing statutory duties under the cultural protection statutes. If the Secretary neglects his enforcement duties, the Tribe can seek relief against the Secretary pursuant to those statutes, just as it could prior to the transfer. *Compare Yankton Sioux Tribe v. U.S. Army Corps of Eng'rs*, 209 F. Supp. 2d 1008 (D.S.D. 2002) (requiring Secretary to follow NAGPRA procedures with respect to certain burial remains discovered on transferred lands) *with Yankton Sioux Tribe v. United States Army Corps of Eng'rs*, 83 F. Supp. 2d 1047 (D.S.D. 2000) (granting a preliminary injunction against Secretary for alleged NAGPRA violations prior to land transfer). Thus, an order vacating the transfer would not redress any future injury suffered by the Tribe.

In conclusion, the Tribe has not suffered an injury in fact stemming from the transfer of lands pursuant to WRDA. The only harms it alleges are speculative and hypothetical,

not actual or imminent. Therefore, the Tribe lacks Article III standing.

### III.   Conclusion

For the foregoing reasons, the Tribe lacks standing to bring this action in federal court. Consequently, we remand the action to the district court for entry of a judgment of dismissal for lack of subject matter jurisdiction.

*So ordered.*