# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 12, 2009          Decided June 26, 2009

No. 08-5133

OGLALA SIOUX TRIBE OF THE PINE RIDGE INDIAN
RESERVATION,
APPELLANT

v.

UNITED STATES ARMY CORPS OF ENGINEERS, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:01-cv-02679-GK)

*Mario Gonzalez* argued the cause for appellant. With him
on the briefs was *Patricia Marks*.

*Robert J. Lundman*, Attorney, U.S. Department of Justice,
argued the cause for appellee. With him on the brief was
*Katherine Hazard*, Attorney. *R. Craig Lawrence*, Assistant U.S.
Attorney, entered an appearance.

Before: HENDERSON and TATEL, *Circuit Judges*, and
RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

Opinion concurring in part, concurring in the judgment in part, and dissenting in part filed by *Circuit Judge* TATEL.

RANDOLPH, *Senior Circuit Judge*: The Great Sioux Reservation once encompassed the western half of present-day South Dakota. This case deals with several federal government properties located along the Missouri River within the area of the former Great Sioux Reservation. The Oglala Sioux Tribe brought this action seeking a declaration that the 1889 Act of Congress dissolving the Great Sioux Reservation never took effect. In addition, the Tribe requested an injunction preventing the United States from transferring title to any land inside the former Reservation without the Tribe's permission, and a writ of mandamus compelling the Army Corps of Engineers to evaluate the Missouri River properties for inclusion in the National Register of Historic Places.

I.

In 1866, representatives of the United States met with leaders of the Sioux tribes at Fort Laramie, in present-day Wyoming, to negotiate a right of passage for settlers and military personnel through Sioux territory. Negotiations broke down, and the Sioux, led by the Oglala chief Red Cloud, fought a series of battles against the U.S. Army for control of Wyoming's Powder River Basin. In 1868, the two sides met again at Fort Laramie, this time signing a peace treaty establishing the Great Sioux Reservation. The treaty provided that the Sioux tribes would enjoy "absolute and undisturbed use and occupation" of the Reservation and prohibited unauthorized non-Indians from entering the land. Treaty with the Sioux Indians, art. 5, Apr. 29, 1868, 15 Stat. 635. The treaty also

provided that "[n]o treaty for the cession of any portion or part of the reservation herein described which may be held in common shall be of any validity or force as against the said Indians, unless executed and signed by at least three fourths of all the adult male Indians, occupying or interested in the same . . . ." *Id.* art. 12.

After the discovery of gold in the western portion of the Great Sioux Reservation in 1874 and more battles between the U.S. Army and the Sioux (including the Battle of Little Big Horn), Congress passed a law in 1877 providing for the cession to the United States of more than 7 million acres of Reservation land in the Black Hills area of western South Dakota. *See* Act of Feb. 28, 1877, 19 Stat. 254; *United States v. Sioux Nation of Indians*, 448 U.S. 371, 374–84 (1980). The Act of March 2, 1889, ch. 405, 25 Stat. 888, passed only months before South Dakota was admitted as a State, purported to dissolve the Great Sioux Reservation, restoring roughly 9 million acres of land to the public domain and dividing the remaining territory into six smaller reservations for the various Sioux tribes. The Act was to take effect only when consent had been obtained from three-fourths of all adult male Sioux in accordance with the 1868 Fort Laramie Treaty, an event to be "made known by proclamation by the President of the United States, upon satisfactory proof presented to him . . . and upon failure of such proof and proclamation this act becomes of no effect and null and void." Act of March 2, 1889 § 28. A three-member commission appointed by the Secretary of the Interior (the "Crook Commission") obtained the requisite number of signatures on quitclaim deeds and submitted a report to President Benjamin Harrison. In 1890 President Harrison issued a proclamation declaring the Act to be in full force.

Non-Indian settlers later gained title to much of the former Great Sioux Reservation land. Thereafter, the Army Corps of

Engineers acquired portions of former Reservation land from Indian and non-Indian owners in order to build dam and reservoir projects and more than one hundred shoreline recreational areas along the Missouri River. *See* Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 887. The Water Resources Development Act of August 17, 1999, Pub. L. 106-53, 113 Stat. 269, directed the Secretary of the Army to transfer title to or grant perpetual leases for many of these federal properties to the State of South Dakota, the Cheyenne River Sioux Tribe, and the Lower Brule Sioux Tribe.

The Oglala Sioux Tribe filed its initial complaint in December 2001, seeking to enjoin the transfers of these Missouri River properties. The complaint contained several claims under the National Historical Preservation Act, 16 U.S.C. §§ 470–470x-6, and other cultural and environmental resource protection statutes. In a previous lawsuit, the Crow Creek Sioux Tribe had filed a complaint making essentially the same claims. In *Crow Creek Sioux Tribe v. Brownlee*, 331 F.2d 912, 916–17 (D.C. Cir. 2003), we determined that the resource protection statutes continued to apply to the Missouri River properties even after their transfer. Thus, the Crow Creek Tribe had suffered no injury and lacked Article III standing to challenge the transfers. *Id.*

After our decision in *Crow Creek*, the district court ordered the Oglala Sioux Tribe to show cause why their case should not be dismissed for lack of subject matter jurisdiction. The Tribe amended its complaint, dropping its prior claims and asserting four new or modified ones. The first three were based on the assertion that the Tribe had an interest in the Missouri River properties because those properties are part of the Great Sioux Reservation, an interest allegedly never diminished or altered by

any act of Congress.[1] Specifically, the Tribe alleged that the 1889 Act dissolving much of the Reservation never went into effect because the Crook Commission failed to obtain valid signatures from three-fourths of the adult male Sioux population. The Tribe's last claim sought mandamus relief requiring the Army Corps of Engineers to evaluate, inventory, and include in the National Register of Historic Places all Native American cultural items and historic areas within the Missouri River properties. Pet'r Br. at 22. The district court dismissed the complaint, ruling that the Tribe lacked standing to bring its first three claims and that mandamus relief could not be granted on its fourth claim. The court determined that, regardless of the fairness or propriety of the ratification, the 1889 Act had taken effect and abrogated any rights held by the Tribe based on the 1868 Fort Laramie Treaty. Accordingly, the Tribe did not have a legally protected interest in the lands at issue. The court also ruled that mandamus relief was inappropriate because the Corps had no plainly prescribed duty to evaluate federal properties in the manner requested by the Tribe.

---

[1]In the Tribe's first claim for relief, it sought a declaratory judgment that the Great Sioux Reservation has never been diminished by any Act of Congress. In its second claim for relief, it sought a declaratory judgment to the effect that the transfers and leases of federal property were without force and effect and an injunction against further transfers. In its third claim for relief, it sought a declaratory judgment that the Army was required to consult with and reasonably accommodate the Tribe before taking any action regarding transfer or management of the properties and mandamus relief compelling such consultation and accommodation. *See* Pet'r Br. at 21–22.

6

II.

Congress has expressly deprived courts of jurisdiction over the subject matter of the Tribe's first three claims.[2] Each of these claims rests on the contention that the United States did not validly implement the 1889 Act, rendering it a nullity. In 1946, the Indian Claims Commission Act, Pub. L. No. 79-726, 60 Stat. 1049 (1946), imposed a 5-year limitations period on Indian claims in law and equity then existing and arising under the Constitution, federal law, and treaties between Indian tribes and the United States. The Act's limitations period applies here.

Before 1946, tribes were unable to pursue claims against the federal government without express congressional authorization. *Otoe & Missouria Tribe of Indians v. United States*, 131 F. Supp. 265, 272 (Ct. Cl. 1955); *see Cohen's Handbook of Federal Indian Law* 443 (2005 ed.). The 1946 Act created the Indian Claims Commission to adjudicate all claims accruing before its effective date, August 13, 1946. Congress's intention was to "draw[] in all claims of ancient wrongs, respecting Indians, and to have them adjudicated once and for all." *Temoak Band of W. Shoshone Indians, Nev. v. United States*, 593 F.2d 994, 998 (Ct. Cl. 1979); *see United States v. Dann*, 470 U.S. 39, 45–46 (1985). Congress deliberately used broad terminology in the Act in order to permit tribes to bring all potential historical claims and to thereby prevent them from returning to Congress to lobby for further redress. *Otoe & Missouria Tribe*, 131 F. Supp. at 272; *see* Indian Claims Commission Act § 2; *Cohen's Handbook of Federal Indian Law*

---

[2]We therefore do not reach the question whether the Tribe has standing to sue. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92, 97 n.2 (1998); *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 353 n.4 (1984)*; Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 101 (1979); *Sierra Club v. Morton*, 405 U.S. 727, 732 (1972).

445 (2005 ed.) (citing H.R. Rep. No. 79-1466, 79th Cong., 1st Sess. 10 (1946)).  To balance this permissiveness and to ensure finality, the Act established a 5-year limitation on all claims existing before 1946; any claim not presented within the 5-year period may not be submitted to any court or administrative agency.  Indian Claims Commission Act § 12; *see Pueblo of Santo Domingo v. United States*, 16 Cl. Ct. 139, 142 (1988); *Minn. Chippewa Tribe v. United States* (*Minn. Chippewa Tribe*), 11 Cl. Ct. 534, 536 (1987).

It is well established that the Indian Claims Commission Act bars claims involving allotments or other property, claims involving title, claims to equitable relief, claims for damages, and related constitutional and procedural claims that accrued before 1946 and were not brought by August 13, 1951.  *See Oglala Sioux Tribe of Pine Ridge Indian Reservation v. United States*, 650 F.2d 140, 141–42 (8th Cir. 1981); *Navajo Tribe of Indians v. New Mexico*, 809 F.2d 1455, 1463–64 (10th Cir. 1987); *Minn. Chippewa Tribe Red Lake Band v. United States* (*Red Lake Band*), 768 F.2d 338, 341–42 (Fed. Cir. 1985); *Minn. Chippewa Tribe*, 11 Cl. Ct. at 536; *Snoqualmie Tribe of Indians v. United States,* 372 F.2d 951, 959 (Ct. Cl. 1967); *W. Shoshone Nat'l Council v. United States*, 279 Fed. Appx. 980, 988 (Fed. Cir. 2008); *Catawba Indian Tribe of S.C. v. United States*, 24 Cl. Ct. 24, 29–30 (1991); *Pueblo of Santo Domingo*, 16 Cl. Ct. at 141–42; *Hannahville Indian Cmty. v. United States*, 4 Cl. Ct. 445, 461 (1983); *Six Nations Confederacy v. Andrus*, 610 F.2d 996, 998 (D.C. Cir. 1979).  A tribe cannot avoid the Indian Claims Commission Act through "artful pleading."  *Cf. Block v. N.D. ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 285 (1983) (citing *Brown v. GSA*, 425 U.S. 820, 833 (1976)); *United States v. Mottaz*, 476 U.S. 834, 847–48 (1986).  It cannot obtain review of a historical land claim otherwise barred by the Act by challenging present-day actions involving the land.  *Catawba Indian Tribe*, 24 Cl. Ct. at 29–30.  Nor can it circumvent the

statutory limitation by styling its grievances as claims for equitable relief against federal officers in their individual capacities, *see* Pet'r Reply Br. at 19. If the Tribe's essential claim is time-barred, reaching these "officer suits" would mean that the Tribe could litigate claims arising before 1946, in direct defiance of Congress's intent in passing the Act. *Cf. Block*, 461 U.S. at 284–85; *Mottaz*, 476 U.S. at 846–47.

The Oglala Sioux Tribe's claims fall under § 2 of the Indian Claims Commission Act, most directly under provision (3), which encompasses "claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity."[3] The Tribe's first three claims would require the court to decide whether to rescind the Sioux Tribe's agreements with the United States approving the 1889 Act's diminishment of the Great Sioux Reservation, to declare that Act null and void, and to treat the area as if the 1868 Treaty had not been modified.[4] The Tribe surely knew that such an action

---

[3]The Tribe's claims also arise under the laws and treaties of the United States, *see* Indian Claims Commission Act § 2(1), and are "based upon [a lack of] fair and honorable dealings," *id.* § 2(5).

[4]Judge Tatel construes the third claim as asserting that the government owes the Tribe a permanent fiduciary duty of consultation before taking any significant action on any land the Tribe has *ever* occupied. This is a novel theory, having no support in federal Indian law, and it is a theory the Tribe itself never mentions in its briefs in this court. The Tribe's argument was instead that it retained an unbroken "aboriginal interest" in its ancestral lands due to the alleged nullity of the 1889 Act. *See, e.g.*, Appellant Br. at 46–47 ("[The 1889 Act] did not, in clear and plain language, either terminate the Great Sioux Reservation or diminish its borders. Consequently, the Tribe

arose before 1946. *Cf. Cheyenne Arapaho Tribes of Okla. v. United States*, 528 F.3d 592 (D.C. Cir. 2009); *Warren v. United States*, 234 F.3d 1331, 1335 (D.C. Cir. 2000). Not only did the 1889 Act purport to divest the Sioux tribes of title to millions of acres of land, but it explicitly returned the land to the public domain and divested it of its reservation status. Act of March 2, 1889, ch. 405, § 21; *see, e.g.*, *DeCoteau v. Dist. Co. Ct. for Tenth Judicial Dist.*, 420 U.S. 425, 446 (1975). A court cannot, 120 years later, adjudicate the validity of the quitclaim deeds and agreements between the Sioux tribes and the United States without violating both the letter and the intent of the Indian Claims Commission Act. As the Eighth Circuit stated in rejecting an analogous claim by the Oglala Sioux concerning a different portion of the former Great Sioux Reservation, "Congress has deprived the district court of subject matter jurisdiction by expressly providing an exclusive remedy" and thereby barring "any other form of relief." *Oglala Sioux Tribe*, 650 F.2d at 142–43; *see also Six Nations Confederacy*, 610 F.2d at 998.

The Tribe answers that the Indian Claims Commission Act does not bar suits to determine a reservation's boundaries. This is generally true, but the Tribe puts the matter much too broadly. The reservation boundary cases do not run afoul of the Indian Claims Commission Act because the courts were being called upon to interpret federal legislation and executive orders, not to set these sources aside or to treat them as void on the basis of centuries-old flaws in the ratification process. In the words of

still retains and may assert a valid aboriginal interest in the recreational and other lands at issue in this case."). Thus, the claim the Tribe does make – as distinguished from the one Judge Tatel offers – depends upon our resolution of a dispute arising in 1890. As such, it is barred by the Indian Claims Commission Act.

10

the Act, the cases do not involve "claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake."[5] But that is precisely what the Tribe's first three claims do involve.

## III.

As to the Tribe's fourth claim, the Army Corps of Engineers does not contest the Tribe's Article III standing to request relief in the nature of mandamus. The question is whether such relief can be granted under the Mandamus Act, 28 U.S.C. § 1361. The Tribe alleged that the Corps owed it a duty under the National Historical Preservation Act to "locate, inventory and nominate for inclusion in the National Register all Native American cultural items and other historic properties within the recreation areas and other lands" in the former Great Sioux Reservation. Pet'r Br. at 22.

Mandamus is a "drastic" remedy available only in "extraordinary situations." *Kerr v. U.S. Dist. Court for N. Dist.*

---

[5]*See* Indian Claims Commission Act § 2(3). None of the Supreme Court's Indian reservation cases addresses *any* dispute between a tribe and the United States, whether over the validity of agreements or otherwise. Rather the cases involve jurisdictional disputes between a tribe and a state government, disputes the Court resolves by interpreting federal laws. *See, e.g.*, *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998); *Hagen v. Utah,* 510 U.S. 399 (1994); *Solem v. Bartlett*, 465 U.S. 463 (1984); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977); *DeCoteau*, 420 U.S. at 425; *Mattz v. Arnett*, 412 U.S. 481 (1973); *Seymour v. Superintendent of Wash. State*, 368 U.S. 351 (1962).

*of Cal.*, 426 U.S. 394, 401 (1976); *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc). A plaintiff seeking mandamus relief has the burden of showing that the defendant owes it a "clear and compelling" duty, *Cheney*, 406 F.3d at 729; *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988), a duty "so plainly prescribed as to be free from doubt and equivalent to a positive command," *Consol. Edison Co. of N.Y., Inc. v. Ashcroft*, 286 F.3d 600, 605 (D.C. Cir. 2002) (quoting *Wilbur v. United States*, 281 U.S. 206, 218–19 (1930)).

The National Historical Preservation Act establishes no clear duty for agencies to evaluate potentially historic sites within a certain time frame or in a certain manner. Rather it provides that, before approving any federal project, federal agencies will "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register." 16 U.S.C. § 470f. Agencies also "shall establish . . . a preservation program for the identification, evaluation, and nomination to the National Register of Historic Places, and protection of historic properties," which must ensure "that historic properties under the jurisdiction or control of the agency, are identified, evaluated, and nominated to the National Register." *Id.* § 470h-2(a)(2)(A). The Tribe does not allege that the Corps has failed to establish an historical preservation program. Nor does it point to any particular statutory duty or command. Instead the Tribe claims that the Corps has failed to act quickly and effectively enough to ensure that the historical properties under its jurisdiction are safe. A court cannot grant mandamus relief on the basis of general objections to agency policies or complaints about the timeliness of agency actions. Because the Tribe did not come close to demonstrating that the Act imposes a clear and compelling duty on agencies to evaluate all historic properties under their jurisdiction on any particular timetable,

the district court had no choice but to dismiss its mandamus claim.

*Affirmed.*

TATEL, *Circuit Judge*, concurring in part, concurring in the judgment in part, and dissenting in part: Given the court's blanket characterization of the Tribe's first three claims for relief, *see* Maj. Op. at 4–5, 6, a little clarification is in order. The Tribe's first claim alleges that the boundaries of the Great Sioux Reservation remain intact despite the 1890 presidential proclamation to the contrary, and it seeks a declaration to this effect. Second Am. Compl. ¶¶ 51–56. Its second claim alleges that certain transfers of land under Title VI of the Water Resources Development Act (WRDA), Pub. L. No. 106-53, §§ 601–09, 113 Stat. 269, 385–97 (1999), *as amended by* Pub. L. No. 106-541, § 540, 114 Stat. 2572, 2664–71 (2000), violate the Tribe's 1868 Fort Laramie Treaty right to consent to any "cession" of land within the Great Sioux Reservation, *see* Treaty with the Sioux Indians, art. XII, Apr. 29, 1868, 15 Stat. 635. Second Am. Compl. ¶¶ 57–62. The third claim alleges that the WRDA transfers violate the government's separate "trust responsibility" to consult with the Tribe before taking any "significant actions" related to its aboriginal land. *Id.* ¶¶ 63–67.

On appeal the Tribe effectively abandons the first of these as an independent claim for relief. *See* Appellant's Reply Br. 20 ("[T]he Tribe is not seeking to obtain judicial review of, or otherwise to challenge, the 1890 proclamation under the APA. [T]he Tribe is seeking . . . the determination of a question of law that must necessarily be determined in order to adjudicate its Second Claim for Relief."); *see also id.* at 12 (arguing that the Tribe has standing to sue only for "any and all recently inflicted wrongs and injuries"); *id.* at 16. Given that, we needn't address the claim at all.

As to the Tribe's second claim, the 1889 Act, the 1890 proclamation, and the resulting alienation of lands within the Great Sioux Reservation are no doubt historical facts. *See* Maj. Op. at 8–9. But unlike the case the court cites for the

proposition that the Tribe "cannot obtain review of a historical land claim otherwise barred by the [Indian Claims Commission] Act by challenging present-day actions involving the land," *id.* at 7, the second claim focuses on the unlawfulness of the current WRDA transfers, not on the government's continuing failure to remedy a historical wrong. *Cf. Catawba Indian Tribe of S.C. v. United States*, 24 Cl. Ct. 24, 29–30 (1991) (post-1946 claims barred where they allege only government's ongoing failure to remedy an 1840 cession of reservation land). Rather than rely on the at best questionable effect of the Indian Claims Commission Act, I would affirm the second claim's dismissal for a more basic reason—that the Tribe lacks standing to pursue it. The Tribe insists that the 1868 Fort Laramie Treaty entitles it to approve the WRDA transfers and claims that the government has deprived it of this right by transferring the lands unilaterally. But this claim is so transparently "frivolous" that we needn't assume its merit for purposes of evaluating standing. *See La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 368 & n.6 (D.C. Cir. 1998) (claim's merits are assumed when evaluating standing unless "entirely frivolous"); *see also Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1030 (D.C. Cir. 2003) (only "non-frivolous contention[s] regarding the meaning of a statute must be taken as correct for purposes of standing"). The WRDA itself makes abundantly clear that these transfers have no effect on existing reservation boundaries. *See* Pub. L. No. 106-53, § 607(a)(4), 113 Stat. 269, 395 ("Nothing in this title diminishes or affects . . . any external boundary of an Indian reservation of an Indian Tribe."). Thus, to the extent the lands at issue are reservation lands, they will remain so even after transfer. As a result, no WRDA transfer, unilateral or otherwise, even implicates—let alone harms—the treaty right to approve "cessions" of reservation land.

As to the Tribe's third claim, the court sweeps it out with the first two, describing it as "based on the assertion" that these lands are still "part of the Great Sioux Reservation" despite the 1889 Act and the 1890 proclamation to the contrary. Maj. Op. at 4–5. And because the Indian Claims Commission could have adjudicated the effect of the 1890 proclamation on the reservation boundaries in 1946, the court concludes, the claim amounts to nothing more than a "historical land claim" that the Tribe may not litigate now, *id.* at 7. I disagree.

In reality the third claim rests not on the contention that the lands are within the Great Sioux Reservation—indeed, the claim concerns many areas that never were, *see* Second Am. Compl. ¶ 40 (alleging that 33 of the 51 lands at issue are *outside* the Great Sioux Reservation)—but rather on the assertion that the lands are "within Oglala aboriginal territory," *id.* *See* Appellant's Opening Br. at 45 (arguing that the Tribe has "aboriginal interests in the lands set aside by [the Fort Laramie Treaty of 1851] for [its] occupancy and use," only "a portion of which . . . eventually became the Great Sioux Reservation"). This, the Tribe quite plainly argues, imposes on the government a "trust responsibility" to consult with the Tribe before "taking any significant actions" as to the lands. Second Am. Compl. ¶¶ 63–67; Appellant's Opening Br. 45–48; *see also id.* at 46 (quoting the district court's characterization of the third claim as asserting that the government "owe[s] the Tribe a trust responsibility based upon [its] aboriginal interest in the land at issue"). And because the majority of the lands at issue in the third claim were never part of the Great Sioux Reservation and thus were entirely unaffected by the 1889 Act and the 1890 proclamation, the claim clearly asserts a legal interest stemming from the Tribe's aboriginal interests in the lands,

4

rather than the "alleged nullity of the 1889 Act," Maj. Op. at 8 n.4.

Although the origins of such a duty (if such a duty exists) would certainly predate 1946, the alleged breach of the duty began in 2002 when the WRDA transfers began. Thus, because this claim could not possibly have existed in 1946—over half a century before the government began executing the WRDA transfers without consulting the Tribe—the Indian Claims Commission Act imposes no bar on its adjudication today.

Of course this conclusion raises the question of the Tribe's standing to bring this claim, which the district court rejected and my colleagues have no occasion to address. *See* Maj. Op. at 5, 6 n.2. The district court ruled that because the Tribe possesses no "legally protected interest" in the land, it failed to allege any injury-in-fact. *See Oglala Sioux Tribe v. U.S. Army Corps of Eng'rs*, 537 F. Supp. 2d 161, 169–72 (D.D.C. 2008). But that reasoning improperly "decid[ed] the merits under the guise of determining the plaintiff's standing," *Info. Handling Servs.*, 338 F.3d at 1030. Unlike the Tribe's second claim, and given the hornbook principle that the "federal government has a trust or special relationship with Indian tribes," 1-5 COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 5.04[4][a], this claim is hardly so frivolous as to justify dispensing with the normal practice of assuming its merit for now. *See Littlewolf v. Lujan*, 877 F.2d 1058, 1063 (D.C. Cir. 1989) (recognizing a general "guardian-ward relationship" between Indian tribes and the government, "deriv[ing] from the historical status of Indian tribes as 'domestic dependent nations,' and the correspondingly pervasive federal control over Indians as embodied in treaties and statutes" (quoting *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831))). To be sure, in light of the decades of private and

government ownership of the Tribe's aboriginal territory, as well as the legacy of the Tribe's treaties with the United States, a Rule 12(b)(6) motion may get the better of this claim too. But at this stage of the litigation, the only question properly before us is whether the challenged conduct injures the Tribe's claimed (and non-frivolous) legal interest in a direct, concrete, and particularized way that a court order would redress. *See City of Waukesha v. EPA*, 320 F.3d 228, 233–35 (D.C. Cir. 2003).

Thus assuming the third claim's legal merit, I have no doubt the Tribe has standing to pursue it. The government's failure to consult the Tribe before proceeding with the WRDA transfers deprived the Tribe of its alleged procedural right to be consulted, and such procedural injuries are redressable where, as here, "there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant," *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). I would therefore reverse the dismissal of the third claim and remand to the district court for consideration of the merits.