Paul L. Maloney, United States District Judge
Plaintiff Little Traverse Bay Bands of Odawa Indians ("the Tribe") filed suit in 2015, claiming that the State of Michigan has continually failed to recognize an Indian Reservation spanning more than 300 square miles in the Northwest portion of Michigan's Lower Peninsula. The Tribe seeks a declaratory judgment from the Court that the claimed Reservation was created via treaty between its predecessor and the Federal Government in 1855, and that the Reservation has continued to exist to this day and has not been diminished or disestablished by any subsequent government action.[1]
The matter is now before the Court on the City and County Intervenor-Defendants' motion for judgment on the pleadings. The Cities and Counties argue that the Tribe should be: (1) judicially estopped from claiming the existence of the Reservation, (2) barred from relitigating the claims under the doctrine of issue preclusion, and (3) barred from raising the claims under the Indian Claims Commission Act by the Act's statute of limitations.[2]
*868 I.
The historical background relevant to the Tribe's claim spans more than 150 years. The Court does not attempt here to fully set forth an exhaustive history of all facts relevant to the claim but offers this limited recitation of the facts for purposes of resolving the Rule 12 motion before it.
The Treaties
The Little Traverse Bay Bands of Odawa Indians are a federally-recognized Indian tribe that traces its origins back to the Odawa Indians (sometimes also referred to as Ottawa) that inhabited land in Northern Michigan. The Odawa were first encountered by European explorers in 1615, and they continued to occupy the northwest corner of Michigan's Lower Peninsula for the next 200 years.
The Odawa began ceding territory to the United States in the 1820s and following decades. First, in 1820, the Tribe's predecessors entered into a treaty with the US government in which it agreed to cede the Saint Martin Islands in exchange for "a quantity of goods."
By the 1830s, the Federal Government's Indian policy became more focused on utilizing treaties to secure cessions of land from Indians, removing Indians from these lands, and encouraging non-Indian settlement of the lands. Thus, the government engaged in many more treaties, including one with the Tribe's predecessors.
In 1836, Henry Schoolcraft negotiated the Treaty of Washington ("1836 Treaty" or "Treaty of Washington") on behalf of the United States with the Odawa. Treaty of Washington, March 28, 1836, 7 Stat. 491. This time, the bands were to cede 13,837,207 acres of Michigan's Lower Peninsula but would retain fourteen reservations within that territory-including a 50,000-acre reservation on Little Traverse Bay. The bands also maintained hunting, fishing, and usufructuary rights in the ceded territory.
After the treaty had been agreed upon, it went to the Senate for ratification. But instead of ratifying the treaty, the Senate modified the treaty terms. Rather than making the reservations permanent, the Senate inserted a clause time-limiting the reservations to five years "unless the United States grant[ed] them permission to remain on said lands for a longer period." See 7 Stat. 497. In return, the Tribe would receive $ 200,000 in consideration for the land, which would generate interest annually until the government reclaimed the land. Id.
After the Senate's unilateral modification, Schoolcraft called a council at Mackinac Island to assure the bands that the government did not intend to remove them from the reservations at the end of the five-year term. (ECF No. 1 at PageID.5; ECF No. 429-3 at PageID.5143.) Thus, the Tribe agreed to the treaty even with the altered terms. And in fact, the government did not enforce the five-year term on the newly-created reservations. (Id. )
On July 31, 1855, the Chippewa and Ottawa Tribes entered into a third treaty-The Treaty of Detroit. Treaty with the Ottawa and Chippewa , 31 July 1855, 11 Stat. 621-629 ("1855 Treaty"). The Tribe now claims that the 1855 Treaty and a corresponding Executive Order established an Indian reservation in Emmet and Charlevoix Counties, which continues to exist to this day and which it relies on in this action. Accordingly, the Court must describe the treaty terms in some detail.
In Article 1, the United States agreed to withdraw from sale public lands certain tracts of land for each of six bands within *869 the Ottawa and Chippewa Indian Tribes. Pertinent here, the government agreed to withdraw from sale the lands two parcels. The first made up of "fractional townships 38 and 39 north, range 11 west-40 north, range 10 west, and in part 39 north, range 9 and 10 west." The second was made up of "townships 29, 30, and 31 north, range 11 west, and townships 29, 30, and 31 north, range 12 west, and the east half of township 29 north, range 9 west" for the bands to which the Tribe is the successor. The government also agreed that it would give each head of a family eighty acres of land from within the parcel and forty acres of land to each single person over the age of 21 or orphan child under 21. Finally, Article I stipulated that any lands that were not selected or appropriated within five years would remain the property of the United States to be disposed of as any other public lands.
In Article 2, the government agreed to pay $ 538,400 to the Chippewa and Ottawa Tribes collectively to provide for various services and infrastructure including: $ 80,000 for educational purposes, $ 75,000 for agricultural and carpentry equipment, $ 306,000 in cash to be distributed per capita to members at a rate of $ 10,000 plus interest per year with the remainder due and payable at the end of the ten-year period, and $ 42,000 for four blacksmith shops.
In Article 3, the Ottawa and Chippewa Tribes agreed "release and discharge the United States from all liability ... for the price and value of all such lands, heretofore sold, and the proceeds of which remain unpaid."
Shortly after the 1855 Treaty was agreed upon, an executive order ordered the lands described to be withdrawn from public sale. Exec. Order (Aug. 9, 1855).
According to the Tribe, the 1855 Treaty was motivated by the uncertainty caused by the sunset-clause in the 1836 Treaty, as the Odawa feared that the government could force them from their lands at any time. (ECF No. 1 at PageID.6.) And it says that by 1854, the government's Indian policy had shifted "to focus on the creation of reservations, with the intent of concentrating Indians on such reservations in order to protect them from the onslaught of non-Indian settlement while simultaneously making the Indians easier for the government and missionary groups to 'civilize.' " (Id. ) The Tribe notes that the Commissioner of Indian Affairs at the time, George Manypenny, was a proponent of this philosophy.[3]
The Tribe alleges that the 1855 Treaty of Detroit was intended as an exercise of this new policy; it asserts that the Treaty was "intended to secure permanent communities and homes for the bands and to insulate their communities from non-Indian settlers" and to "simplify" the planned "civilization" of the Tribes. As the Tribe reads them, the Executive Order and 1855 Treaty guaranteed that the predecessor bands of the Plaintiff Little Traverse Bay Bands of Odawa Indians would never have to leave a small portion of their ancestral *870 homelands reserved to them and their future generations, and that they would have the power to exercise their sovereign powers within the boundaries of their reservation, which stretches 32 miles north-to-south from the northern tip of Michigan's lower peninsula along the eastern shore of Little Traverse Bay.
The Establishment of the Indian Claims Commission
Historically, the only way for Indian tribes to resolve grievances against the United States was through Congress. Oglala Sioux Tribe of Pine Ridge Indian Reservation v. U.S. Army Corps of Engineers , 570 F.3d 327, 331 (D.C. Cir. 2009). Prior to 1946, the Court of Claims was expressly prohibited from entertaining suits based on treaties, Act of Mar. 3, 1863, ch. 92, § 9, 12 Stat. 765, and courts were barred by sovereign immunity on non-treaty claims. But between 1836 and 1946, Indian tribes successfully lobbied Congress to enact special jurisdictional statutes to allow the Court of Claims to hear specific claims on 142 occasions.
However, by 1928, it was obvious that the case-by-case practice of granting jurisdiction was problematic and inefficient. See The Problem of Indian Administration , 48, 805-11 (John Miriam ed. 1928) ("The Miriam Report"). Congress responded to the problem by enacting "comprehensive legislation for the adjudication of both ancient and contemporary tribal claims against the federal government" with the Indian Claims Commission Act. See Indian Claims Commission Act of 1946, § 12 Pub. L. No. 79-726, 60 Stat. 1049 (later repealed but codified at 28 U.S.C. § 1505, 25 U.S.C. § 70 et seq. ). The Act granted jurisdiction to the newly-created Indian Claims Commission to hear virtually all historic claims by Indian Tribes against the United States, including claims for "inequitable and fair treatment" and even claims "based upon fair and honorable dealings that are not recognized by any existing court of law or equity." ICCA, § 2(5).
Congress's intention was to "draw [ ] in all claims of ancient wrongs, respecting Indians, and to have them adjudicated once and for all." Temoak Band of W. Shoshone Indians, Nev. v. United States , 219 Ct.Cl. 346, 593 F.2d 994, 998 (1979). "Congress deliberately used broad terminology in the Act in order to permit tribes to bring all potential historical claims and to thereby prevent them from returning to Congress to lobby for further redress." Oglala Sioux Tribe , 570 F.3d at 331.
The Act also waived statute of limitations and laches as defenses, but provided that the ICC would only have jurisdiction to hear claims filed on or before August 13, 1951. Id. (citing 60 Stat. 1049, 1052 (1946) ). The Act also anticipated that the ICC would cease operations after ten years, but given the enormous caseload, subsequent acts of Congress extended its lifespan to September 30, 1978, at which point, 102 pending claims were transferred to the Court of Claims for completion.
Relevant Claims before the ICC
The Tribe's predecessor filed several claims with the ICC that are relevant to this proceeding. First, in ICC Docket No. 58, it asserted that the United States had given consideration that was grossly inadequate and unconscionable for the land ceded in the Treaty of 1836. (ECF No. 429-1.) Specifically, the Ottawa and Chippewa Indians asserted that they had ceded 13,737,000 acres of land-including the land for which the Tribe now asserts a reservation-and was paid only 16.8 cents per acre. (PageID.5116.) The petition sought compensation for the reasonable value of the land ceded in the 1836 Treaty, costs, and attorney fees. (Id. )
Another petition, filed in 1949 as Docket Number 18E, also implicated the Treaty of 1836. (ECF No. 429-2.) There, several *871 bands of the Chippewa Tribe asserted that they had been given inadequate consideration based on the same treaty. (PageID.5127.) They asserted that the consideration for the cession was $ 2,300,000, which "amounted to a fraction of the value of the lands ceded and constituted and was an unconscionable consideration." This petition also sought compensation for the lands ceded under the Treaty of 1820.
The ICC consolidated Dockets 18E and 58 into a single action. And on May 20, 1959, the ICC issued its first Findings of Fact, addressing standing and title to the land in question. See 7 Ind. Cl. Comm. 576 (available in the record at ECF No. 429-3.) In ¶ 5, the ICC concluded that Royce Area 205 was ceded to the United States by the Chippewa and Ottawa nations of Indians on March 28, 1836, but that the Tribes had retained Reservations on 401,971 acres of land in Articles Two and Three of the Treaty. (PageID.5141.) This included "one tract of fifty-thousand acres to be located on Little Traverse Bay." (Id. ) The ICC further found that the reservations were limited in duration, based on the modifications in Article Four of the Treaty, which recited that the United States would pay $ 200,000 "in consideration of changing the permanent reservations in article two and article three to reservations for five years only, to be paid whenever their reservations shall be surrendered, and until that time, the interest on said two hundred thousand dollars shall be annually paid to the Indians." (PageID.5143.)
Nine years later, the ICC issued an opinion on the valuation of the land ceded in the 1836 Treaty, finding that it had a valuation of ninety cents per acre. See 20 Ind. Cl. Comm. 137 (Dec. 23, 1968) (available in the record at ECF No. 429-4.) Based on this finding, the Commission found that the fair market value of the land ceded by the Tribe was $ 10,800,000. (PageID.5178.)
Then, in the final stage of the case, the Commission determined what consideration the Tribe had received, and whether the United States was entitled to any offsets under the ICCA. The government had argued that it was entitled to an offset for the 121,450 acres that was allotted to individual members of the Tribes in the 1860s and 1870s, per Article I of the 1855 Treaty. The government argued that the individual allotments should be deemed consideration for the land cession memorialized in the 1836 Treaty.
The Commission rejected the argument in an opinion on January 14, 1970, concluding that individual allotments were made up of land "collectively ceded in 1836, but on which [the Tribal members] had continued to reside," as they were allowed to do until they were needed for settlement. See 22 Ind. Cl. Comm. 372 (available on the record at ECF No. 429-5.) The Commission viewed the allotments as "a viable alternative to the unworkable plan" created by the 1836 Treaty, which called for the Tribe to be relocated into Northeast Minnesota ("the lands between Lake Superior and the Mississippi"). (PageID.5220.) Since the United States "saved itself the effort and expense of relocation, as well as the cost of lands" which it had obligated itself to purchase, the Commission ruled that the allotments were not part of the consideration for the 1836 Treaty. (Id. )
In spite of this ruling, the Commission held that the United States did not owe the tribe additional compensation for the 121,450 acres that it had allotted to the individual members of the Tribe, reasoning that the Indians could not recover additional compensation for lands that were given to them. (PageID.5222.) Thus, the Commission deducted $ 109,305.67 from the total compensation owed to the Tribe. (Id. )
*872 Eventually, after reconsideration of several issues, the Commission issued a final award in favor of the plaintiffs for $ 10,300,247 and an amended judgment was later entered in the amount of $ 10,109,003.55 (which reflected one payment by the government in the amount of $ 191,243.48). (See ECF Nos. 429-7; 429-8; 429-9.)
Finally, the Tribe's predecessors filed a third pertinent petition with the ICC on August 13, 1951, which was assigned Docket Number 364. In this petition, the Tribe raised four claims relating to the Treaty of 1855. Most importantly, the Tribe sought compensation for the value of lands which members of the tribes should have had allotted to them but were not. The government moved to dismiss that particular claim, and the Commission agreed. 35 Ind. Cl. Comm. 385 (available in the record at ECF No. 429-10.) The ICC explained its understanding of the 1855 Treaty:
The 1855 Treaty marked the government's abandonment of the removal scheme. Article I partially restored the land ceded in 1836, but this time in the form of individual allotments. (citing Dockets 18-5 and 58, 22 Ind. Cl. Comm. 372, 375 (1970) ).
(PageID.5261.) In light of that understanding, the Commission held that Tribe had already been compensated for any unallotted lands by virtue of the prior ICC petition before it. In that earlier proceeding, it had "asked no questions about whether some of the rest of the land should have been allotted[,]" and had instead "awarded compensation for all of it." (PageID.5263.) Thus, the Commission found that the claim for the value of allegedly unallotted land was barred by the resolution of the petition filed in Docket 18E. (Id. )
II.
"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 479 F.2d 478, 480 (6th Cir.1973). But the Court "need not accept as true legal conclusions or unwarranted factual inferences." Mixon v. Ohio, 193 F.3d 389, 400 (6th Cir.1999). A Rule 12(c) motion "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." Paskvan v. City of Cleveland Civil Serv. Comm'n, 946 F.2d 1233, 1235 (6th Cir.1991).
In reviewing a motion to dismiss, the Court "may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." Bassett v. NCAA , 528 F.3d 426, 430 (6th Cir.2008). Here, the Defendants lean heavily on public records relating to the ICC, but the Court may resolve the motion without converting it to a motion for summary judgment. Kreipke v. Wayne State Univ. , 807 F.3d 768 (6th Cir. 2015).
However, the Tribe points to another procedural irregularity in the motion: The Cities and Counties are relying on in large part on estoppel, which they did not plead as an affirmative defense. The Tribe asserts that, had the Cities and Counties pleaded such an affirmative defense, it may have filed a motion to strike under Rule 12(f), but by the time the instant motion was filed, the deadline for a motion to strike had long passed. The Tribe thus urges the Court to convert the motion to one for summary judgment. The Cities and Counties do not respond to this argument in their reply brief. Ultimately, since the *873 motion relies on purely legal defenses, it makes little difference whether the motions are construed under Rule 12 or Rule 56, but because neither party has cited matters outside of the pleadings or public records, the Court considers it a motion under Rule 12.
III.
The Cities and Counties seek judgment on the pleadings and offer three arguments for the Court to do so: judicial estoppel, issue preclusion, and lack of jurisdiction/statute of limitations under ICCA.
Judicial Estoppel. First, the Cities and Counties allege that before the ICC, the Tribe's predecessor took positions that are materially inconsistent with the position it now advances, so they advocate for the Court to invoke judicial estoppel to prevent the Tribe claiming that it retains an interest in the alleged reservation. Specifically, the Cities and Counties point towards the ICC proceedings in which the Chippewa and Ottawa alleged that they had been totally divested of 13 million acres of land for unconscionable consideration, which led to a final judgment of more than ten million dollars.
The Cities and Counties argue that Tribe's position in the ICC litigation is clearly inconsistent with the instant case, because the Tribe had previously demanded compensation for all of the lands they had ceded, and they prevailed on those claims. And now, their position is that the Treaty of 1855 created a permanent reservation on Little Traverse Bay. The Cities and Counties assert that, had the Tribe retained such a reservation, the government would have been entitled to a set-off to deduct the value of the reservation from the ultimate award, but it did not pursue such an offset because no one believed that a reservation had been created.
In response, the Tribe asserts that the right to title is not the same as jurisdiction. In other words, they do not contest that their predecessors ceded 13 million acres of land under the Treaty of 1836, and that they fully litigated their claims against the United States for the compensation they were entitled to under ICCA. However, the Tribe argues because jurisdiction and title are distinct concepts, their position in this litigation is perfectly consistent with its claims before the ICC.
"Judicial estoppel is an equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." Teledyne Indus., Inc. v. NLRB , 911 F.2d 1214, 1217-18 (6th Cir. 1990) ; see also New Hampshire v. Maine , 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). "The doctrine of judicial estoppel bars a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where (2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.' " Browning v. Levy , 283 F.3d 761, 775 (6th Cir. 2002) (quoting Teledyne , 911 F.2d at 1218 ). The doctrine of judicial estoppel, however, "is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement." Teledyne , 911 F.2d at 1218 (footnote omitted). Moreover, a court should consider whether a party has gained an unfair advantage from the court's adoption of its earlier inconsistent statement. New Hampshire , 532 U.S. at 751, 121 S.Ct. 1808.
The Cities and Counties' argument bears great resemblance to the argument *874 made and rejected before the Seventh Circuit in Menominee Indian Tribe of Wisconsin v. Thompson , 161 F.3d 449 (7th Cir. 1998). There, the Menominee Indian Tribe sought declaratory and injunctive relief from Wisconsin state officials, claiming it had retained off-reservation usufructuary rights on lands within the State. The defendants moved to dismiss, arguing, inter alia , judicial estoppel. As the Seventh Circuit summarized:
The defendants contend that the Menominee Tribe may not assert usufructuary rights off-reservation because in prior cases it took the position that the various treaties at issue in this case resulted in the cession of all "right, title, and interest in and to" their Wisconsin land.
Specifically, the defendants point to several claims filed in the Indian Claims Commission in which the Tribe sought compensation for the cessation of "right, title, and interest" to off-reservation lands embodied in the 1848 and 1854 Treaties. These claims were later consolidated and settled for $ 8,500,000.
Additionally, the defendants maintain that, in a case decided by the Supreme Court in 1968, the Menominee alleged that in exchange for on-reservation usufructuary rights immune to state regulation the Tribe relinquished all right, title and interest to lands ceded in the 1831, 1836 and 1848 Treaties.
Id. at 455 (emphasis added) (citations omitted). Although the court ultimately affirmed the district court's dismissal of the complaint, it concluded that judicial estoppel did not bar the tribe from asserting its continued right to usufructuary rights on certain lands off of its reservations. Id.
As to the claims presented to the ICC, the court held that judicial estoppel was unwarranted because the only claims raised in those proceedings were that the United States had underpaid the Menominee Tribe for the title to their Wisconsin lands, and thus, the court reasoned that it could not "be said with certainty that the parties to the Claims Commission litigation understood the Tribe's claims to encompass use rights, as opposed to occupancy rights or title to the ceded lands." Id.
Here, like in Menominee Tribe , the Tribe's proceedings before the ICC are raised as potential grounds for judicial estoppel. But as the Seventh Circuit explained, "it cannot be said with certainty" that the parties to the ICC proceedings understood that the claims at issue encompassed the Tribes' right to exercise jurisdiction over the land in question. The claims presented to the ICC by the Tribe's predecessor arose from the cession of title to land for inadequate compensation; the claims did not address whether or not a reservation had been created in 1855 or whether a reservation continued to exist between 1855 and the time of that litigation. Accordingly, the Court does not find that the Tribe's current litigation position is contrary to its position in the ICC proceedings, which resulted in their predecessor's successful claim for inadequate compensation based on the cession of lands in 1836. Thus, judicial estoppel is inapplicable to the current claims.
Issue Preclusion.
The Cities and Counties also pursue a parallel theory for issue preclusion. It fails for largely the same reason as the judicial estoppel argument.
Issue preclusion "refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." Rawe v. Liberty Mut. Fire Ins. Co , 462 F.3d 521, 528 n.5 (6th Cir. 2006). It "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs *875 in the context of a different claim." Taylor v. Sturgell , 553 U.S. 880, 892, 128 S.Ct. 2161, 171 L.Ed.2d 155 (2008) (internal quotation marks and citation omitted).
Issue preclusion applies where: (1) the identical issue was raised and actually litigated in a prior proceeding; (2) the determination of the issue was necessary to the outcome of the prior proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding. Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto., Aerospace & Agric. Implement Workers, UAW , 97 F.3d 155, 161 (6th Cir. 1996). More specifically, when a litigant asserts issue preclusion based on ICC proceedings, the Court must examine the record and pleadings of an ICC proceeding "to determine whether an issue was actually litigated and necessary to the outcome of a case." Mille Lacs Band of Chippewa Indians v. State of Minn. , 853 F.Supp. 1118, 1137 (D. Minn. 1994), aff'd 124 F.3d 904 (8th Cir. 1995), aff'd 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999).
The Cities and Counties take the position that the Tribe's asserted right to a reservation was actually litigated in the ICC proceedings. However, it does not appear to the Court that the ICC ever litigated whether the 1855 Treaty created a permanent reservation. In Dockets 18E and 58, the ICC considered only whether the government had given inadequate consideration for the land ceded by the Tribe by the Treaty of 1836. That litigation cannot have any issue preclusive effect on the Tribe's current claims, because the current claims were not "actually litigated."
While the Cities and Counties argue that the United States could have asserted a set-off for the value of the continued existence of the reservation,[4] there is no indication that it attempted to do so or that the eventual judgment in favor of the Tribe incorporated a decision that the reservation had been disestablished. This is insufficient for application of issue preckusion. See, e.g. , Mille Lacs Band of Chippewa Indians v. Minnesota , 853 F.Supp. 1118 (D. Minn. 1994) ("The ICC's award of compensation for the lands ceded under the 1837 Treaty based upon their highest and best valuation does not indicate that the ICC concluded that the usufructuary rights had been extinguished."); id. ("If the ICC had been awarding compensation for the reserved rights, it would have had to make a finding that they were extinguished."); Mille Lacs Cir. Ct. , 124 F.3d at 925 ("We cannot accept the conclusion that [the ICC] extinguished an important body of rights bargained for and explicitly reserved in a treaty without any mention of those rights."), aff'd , 526 U.S. 172, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) ; see also Ottawa Tribe of Oklahoma v. Speck , 447 F.Supp.2d 835, 843 (N.D. Ohio 2006) ("Absent specific language addressing the reserved hunting and fishing rights, the decisions of the ICC do not reflect actual litigation of that issue.").
Accordingly, the ICC's consideration of the individual allotments cannot bear on the issue here as "allotment in severalty to individual Indians ... is entirely consistent with continued reservation status."
*876 Navajo Tribe of Indians v. New Mexico , 809 F.2d 1455, 1475 (10th Cir. 1987).
Nor can the litigation that occurred under Docket 364 support issue preclusion. There, the Tribe's predecessor did invoke the Treaty of 1855 as the basis for the action, but the only claim pertaining to land focused on the value of allegedly unallotted land. The ICC determined that the previous ICC litigation had compensated the tribe for the full value of the land without regard to whether or not it had actually been allotted, such that the Tribe could not later seek additional compensation for land that had gone unallotted.
The Tribe did not argue before the ICC that the Treaty of 1855 created a reservation or that the Treaty of 1855 authorized it to assert its jurisdiction over any of the lands, despite ceding title. Therefore, the ICC opinion of January 27, 1975, which described the 1855 Treaty as "mark[ing] the Government's abandonment of the removal scheme" imposed by the Treaty of 1836 and restoring some of the lands ceded in 1836 "in the form of individual allotments" will not provide a basis for issue preclusion. While the ICC wrote of its understanding of the purpose and effect of the two pertinent treaties, the effect of the 1855 Treaty as to jurisdiction-as opposed to title-was not litigated. Accordingly, the Court cannot grant the Cities and Counties' motion on this ground. See supra Mille Lacs; Speck.
Statute of Limitations & the Jurisdictional Bar of the Indian Claims Commission Act.
Finally, the Cities and Counties argue that the Indian Claims Commission Act itself bars the Tribe's claim.
Congress enacted the Indian Claims Commission Act in 1946 to hear and determine all tribal claims against the United States that accrued before August 13, 1946. The ICCA confined the Commission's jurisdiction to tribal claims that accrued before its 1946 enactment, while it conferred jurisdiction on the Court of Claims to adjudicate any tribal claim accruing after 1946 that would be cognizable in the Court of Claims if the claimant were not an Indian tribe. ICCA § 24, 28 U.S.C. § 1505 (1982). Congress also limited the period for filing tribal claims with the Indian Claims Commission to five years. Any claim that accrued before August 13, 1946, and which was not filed with the Commission by August 13, 1951, could not "thereafter be submitted to any court or administrative agency for consideration," nor could such a claim "thereafter be entertained by the Congress." ICCA § 12, 25 U.S.C. § 70k (1976). In addition, the Act provided that "payment of any claim ... shall be a full discharge of the United States of all claims and demands touching any of the matters involved in the controversy. Id. § 70u.
Here, the Cities and Counties argue that the Tribe is barred from bringing this action because the claim arose prior to 1946. When taking the Tribe's complaint to be true, this argument is unpersuasive for several reasons.
First, the ICC lacked authority to litigate the jurisdictional claim now brought by Tribe. The ICC did not have "jurisdiction to extinguish title on its own authority; it simply had jurisdiction to award damages for takings or other wrongs that occurred on or before August 13, 1946." United States v. Dann , 873 F.2d 1189, 1198 (9th Cir. 1989). "The [Tribe's] claims in this action are based on its position that its [right to a reservation] w[as] never extinguished. The ICC would have dismissed any claim relying on existing rights for lack of jurisdiction." Mille Lacs Dist. Ct. , 853 F.Supp. at 1139. In other words, while the ICC could have adjudicated a claim that prior to 1946, the reservation had been disestablished by the Federal *877 Government, it could not adjudicate a suit based on the Tribe's claim that it maintains a reservation and that the State of Michigan has interfered with its ability to exercise its authority on the reservation. Id.
Second, the ICC could not hear the Tribe's claim as it seeks only relief from the State of Michigan, and the ICC was limited to adjudicating claims against the United States. Id. (citing Sokaogon Chippewa Community v. Wisconsin , 879 F.2d 300, 302 (7th Cir. 1989) ; Speck, 447 F.Supp.2d at 841-42.
Third, despite the broad scope of the ICCA, the Tribe's claim does not fall under any of the five categories that the ICC was authorized to adjudicate. The Tribe asserts that the Treaty of 1855 created a reservation. And if the cause of action the Tribe flowed from the Treaty of 1855, perhaps there would be an argument that ICCA bars the claim under ICCA § 2(1) as a claim arising under a treaty of the United States.
However, the Tribe's claim, taken as pleaded, does not arise from the Treaty itself. Like the claim in Mille Lacs , the Tribe alleges that its cause of action arises from current violations of its treaty rights by the State in which it is located, which could not have been brought before the ICC because they had not yet occurred. See 853 F.Supp. at 1139-40.
In sum, the Tribe has pleaded a claim that is not barred by the Indian Claims Commission Act.[5]
The caselaw cited by the Cities and Counties does not alter this conclusion. First, in Navajo Tribe , the case began with a claim before the ICC, filed by the Navajo Tribe, seeking compensation for the cession of its lands to the United States under the Treaty of June 1, 1868. See Navajo Tribe of Indians v. State of NewMexico , 809 F.2d 1455, 1458-60 (10th Cir. 1987). The core contention was that the Navajo Tribe held aboriginal title to 40 million acres of land at the time of the Treaty, and that the government had paid an unconscionably low sum for the land. Id. The ICC agreed, finding that the tribe held title, and that it was entitled to additional compensation. The ICC findings led to a final judgment of $ 14.8 million, entered in 1981. Id. at 1461-62.
The next year, the Navajo Tribe filed suit in federal district court against the United States and the State of New Mexico seeking a declaratory judgment that it had equitable title to other, unallotted lands that had been added to the Navajo Reservation by two executive orders, but which had been restored to the public domain in two subsequent executive orders. Id. The tribe reasoned that the government had breached its fiduciary duty to the tribe, and so it urged the court to declare the latter two executive orders void. Id.
The district court dismissed the complaint for lack of subject-matter jurisdiction:
The Tribe's claims against the United States accrued prior to 1946 and fell within the exclusive jurisdiction of the Indian Claims Commission. Having failed to pursue the exclusive remedy *878 available under the ICCA within the time prescribed in § 70k of the Act, the Tribe may not now seek relief in this Court.
On appeal, the Tribe contended that the district court erred by concluding that the claim raised in the complaint was a "claim" within the exclusive jurisdiction of the Indian Claims Commission. Id. at 1463. It reasoned that because the Commission "was only authorized to award money damages for the extinguishment of title to Indian lands," its suit to establish the Tribe's existing title to land, could not have been entertained before the Commission. Id.
The Tenth Circuit affirmed the dismissal by the district court in a lengthy opinion. It first rejected the Tribe's attempt to narrowly define "claim" for purposes of the ICC:
The Tribe's assertion that the ICC was only empowered to hear controversies involving a 'taking' of land, where Indian title was concededly extinguished, entails far too restrictive an interpretation of the word "claim" under the ICCA.
The court explained that the purpose of the ICCA was to "dispose of the Indian Claims problem with finality." Id. at 1464 (quoting United States v. Dann , 470 U.S. 39, 45, 105 S.Ct. 1058, 84 L.Ed.2d 28 (1985) ). Congress had recognized that Indian claims were "varied in their nature and origin," so it had granted the ICC jurisdiction that was "as broad as possible." Id. And the legislative history also supported that understanding: The House Committee responsible for drafting the ICCA was of the unanimous opinion that "the jurisdiction ought to be broad enough so that no tribe could come back to Congress ten years [later] and say that it had a meritorious claim which the Claims Commission was not authorized to consider." Id. (quoting 92 Cong. Rec. 5312 (1946) ). The ICCA thus explicitly authorized five types of claims, which enveloped "all possible accrued claims":
The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claim in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.
ICCA § 2, 25 U.S.C. § 70a (1976). The court thus explained that while perhaps a taking of land by the government for less-than-adequate compensation may have been the most frequent claim adjudicated by the ICC, "in no means ... was [this type of action] the sole land-interest claim within the Commission's jurisdiction." Id.
The Navajo Tribe court then analogized to Yankton Sioux Tribe of Indians v. United States , a Supreme Court case which predated the enactment of the *879 ICCA. Id. at 1466 (citing Yankton , 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294 (1926) ). There, the Yankton Sioux Tribe successfully lobbied Congress to pass an act authorizing jurisdiction for the Court of Claims to "hear, and report a finding of fact" to establish what interest, title, ownership, or right of possession the tribe may have possessed to a certain tract of land. Id. The case eventually went to the Supreme Court, which concluded that the Yankton Sioux Tribe did possess title to the land and ordered just compensation for the land as a taking under the power of eminent domain. The Navajo Tribe court found the relief granted by the Supreme Court in Yankton highly relevant to the case before it:
It is significant that the Court ordered monetary compensation "as for" a taking because of non-Indian settlement of the lands, even though it recognized the Indians' fee title. That decision, like the early decision that the Indian Claims Commission was only empowered to award money damages, goes to the heart of the Tribe's argument in this case.
The Tribe, even if it had timely filed its claim under the ICCA, could not have quieted title in these lands or maintained an action in ejectment. However, its assertion of present title could have been heard before the Commission, just as the Yankton Sioux Tribe's claim was heard under an ICCA-precursor jurisdictional act. The Tribe simply would have had to accept just monetary compensation if the Commission found their claim to title valid.
This restriction as to remedy represents a fundamental policy choice made by Congress out of the sheer, pragmatic necessity that, although any and all accrued claims could be heard before the Commission, land title in 1946 could not be disturbed because of the sorry injustices suffered by native Americans in the eighteenth, nineteenth, and early twentieth centuries.
Id. at 1466-67.
The Court then further faulted the tribe for conflating concepts of claims and remedies and collapsing the distinct concepts into a single, jurisdictional question. Id. at 1467. The Court explained that "the underlying substantive claim" established the Commission's jurisdiction because under the Tribe's remedy-based theory, artful pleading would allow litigants to circumvent the Act. Id. In sum, the Navajo Tribe court held that since the tribe's claim arose under executive orders of the President and had accrued prior to 1946, the tribe was required to present it to the Commission within the five-year statute of limitations. Id. at 1468-69.
Here, as indicated earlier, the Tribe's claim does not emanate from an action of the federal government that occurred prior to 1946, like the executive orders at issue in Navajo Tribe . Instead, the claim arises from the State of Michigan's alleged failure to recognize the Tribe's reservation. Moreover, as the Navajo Tribe court explained, "adjudicating reservation boundaries is conceptually quite distinct from adjudicating title to the same lands." Id. at 1475. In fact, the two inquiries are so distinct that they do not "necessarily have anything in common with the other" because "title and reservation statutes [were] not congruent concepts" in Indian law. Id. (quoting Ute Indian Tribe v. Utah , 773 F.2d 1087, 1097 (10th Cir. 1985) (en banc) (Seymour, J., concurring), cert denied , 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986).
The Navajo Tribe panel further noted that "allotment in severalty to individual Indians and subsequent entry by Non-Indians is entirely consistent with continued reservation status." Id. (quoting Ute Indian Tribe ). As pleaded, the Tribe has *880 brought a boundary adjudication case. Navajo Tribe was a cession of title case. Thus, Navajo Tribe is also factually distinguishable because the injury alleged emanated from an executive order, and the tribe sought relief from the federal government.
The Cities and Counties also rely on Western Shoshone National Council v. Molini, 951 F.2d 200 (9th Cir. 1991). There, the Shoshone Tribe sought to enjoin Nevada Department of Wildlife regulations because the regulations allegedly interfered with the tribe's right to hunt and fish. Id. at 201. However, the district court granted summary judgment, accepting the state's argument that prior litigation before the ICC had conclusively established that the tribe no longer held any title to the lands in question. Id. Specifically, the ICC had held that Shoshone title to the land in question had been extinguished "by the gradual encroachment by whites, settlers, and others, and the acquisition, disposition or taking of their lands by the United States" and ordered the United States to pay $ 26 million in compensation for "full title extinguishment." Id.
On appeal, the Shoshone argued that the ICC litigation had involved only an adjudication of rights between the United States and the tribe, so it could not have raised its claim against the State of Nevada in the prior litigation. Id. at 202. Thus, it asserted that the statutory bar of § 12, 25 U.S.C. § 70u, was not applicable. Id. The Ninth Circuit disagreed, noting that in two prior decisions, it had held that a Commission award barred an Indian tribe from later asserting title in actions against states. The court found the argument presented to be indistinguishable from the earlier binding precedents and held "that the award in [the ICC litigation] constituted a general determination of title which bar[red] the Shoshone from asserting title against the State of Nevada." 951 F.2d at 202.
In large part, the Shoshone court relied on the Supreme Court's opinion in Oregon Department of Fish and Wildlife v. Klamath , in which the Supreme Court construed a 1901 agreement between the Klamath Tribe and United States giving up certain lands that had formerly been part of the Tribe's reservation. Id. at 202-03 (citing 473 U.S. 753, 760, 105 S.Ct. 3420, 87 L.Ed.2d 542 (1985). The Klamath court interpreted language in the agreement that the Klamath would "cede, surrender, grant, and convey to the United States all their claim, right, title, and interest" in reservation lands to exterminate the tribe's special hunting and fishing rights that it had previously possessed. Id. Thus, the Shoshone Court reasoned that under Klamath , § 70u barred the Shoshone Tribe from asserting their treaty rights in litigation against the State of Nevada because the ICC had ordered the government to pay compensation for "full title extinguishment." Id.
Accordingly, the Cities and Counties argue that the Court can follow Shoshone 's rationale, and find that § 70u bars the Tribe's claim, despite the federal government not being party to this suit. In other words, the Cities and Counties assert that if the Shoshone were barred from asserting their hunting and fishing rights against the State of Nevada because the ICC concluded that its title to the lands in question had been extinguished, the same should be true for the Tribe here.
However, key to the Shoshone panel's conclusion was a finding that there was no treaty granting the hunting and fishing rights asserted. Instead, the Shoshone Tribe was asserting aboriginal fishing and hunting rights. See id. at 203. Therefore, the court distinguished from several other circuit opinions which had concluded that *881 treaty-based rights could not be extinguished absent an express termination of those rights. Id.
Here, the Tribe asserts treaty rights stemming from the Treaty of 1855. Applying Western Shoshone 's exception to the ordinary rule-that treaty-based rights may only be extinguished by express termination-would be erroneous, especially in the case's current posture. Cf. Mille Lacs Dist. Ct., 853 F.Supp. at 1138 (denying summary judgment to the State-Defendant even though the ICC had adjudicated the tribe's treaty-based claim for inadequate compensation for lands ceded; the same treaty had also explicitly reserved usufructuary rights, and it remained unclear whether those rights had also been terminated).
In sum, the Indian Claims Commission Act only bars federal court litigation when the claims could have been brought prior to 1946 and are brought against the United States. While the Tribe's claim in this case relates to rights under a treaty with the United States, it has sued the State of Michigan for failing to recognize its alleged reservation. Such a claim meets neither of ICCA's prerequisites.
IV.
For the reasons just explained, the Court will DENY the Cities and Counties' motion for judgment on the pleadings.
ORDER
For the reasons given in the accompanying opinion, the Intervenor-Defendants' (Charlevoix County, Emmet County, Harbor Springs, and Petoskey) Motion for Judgment on the Pleadings (ECF No. 420 ) is DENIED.

The Court allowed various local units of government and related entities to intervene as Defendants, (See ECF No. 38 ), as well as two associations. (ECF No. 50 ).
The Court then issued an order bifurcating the case into two parts: (1) whether an Indian reservation had been created and if it had, if it was later diminished by Congress-issues to which equitable defenses cannot apply; and (2) whether any equitable defenses were implicated by the relief sought by the Tribe. The parties thus proceeded through discovery on phase one, focusing on whether a reservation had been created and, if a reservation was created, whether it had subsequently been diminished. (ECF No. 91 ).

The State of Michigan did not join the Cities and Counties' motion, but it noted that it intends to use evidence concerning the ICC proceedings in its own dispositive motion. (ECF No. 459.) The Township Defendants filed a Notice of Joinder and Concurrence in the motion. (ECF No. 534.) Finally, the Court struck an untimely response in support of the motion by the Association Defendants. (ECF Nos. 533; 535; 539.)

In the Annual Report of the Commission of Indian Affairs for the year 1853, the BIA superintendent responsible for Michigan suggested that in lieu of lands West of the Mississippi which the bands were entitled to under the Treaty of 1836, the United States could "grant" the Chippewa and Ottawa a reasonable amount of land within Michigan. The 1853 report suggested that "[t]he whole should be held for them in trust by the general government or the State of Michigan, and only conveyed to them in fee as they become sufficiently enlighten to be capable of taking charge of themselves."
The following year in the Annual Report, Manypenny noted that "[t]he peculiar and unfortunate situation of the Indians in Michigan ... was fully stated last year, and the measure deemed best for their preservation and welfare suggested."

(See e.g., ECF No. 530 at PageID.6203 ("If a reservation existed, either as a result of the 1836 Treaty, or as plaintiff now argues as a result of the 1855 Treaty without regard to the 1836 Treaty, the United States would obviously have raised that as a defense to the claim for additional compensation for the original cession or in response to the demand for an accounting under the 1855 Treaty.").)

"A tribe cannot avoid the Indian Claims Commission Act through 'artful pleading.' " Oglala Sioux Tribe v. U.S. Army Corp. of Engs. , 570 F.3d 327, 332 (D.C. Cir. 2009). Nor can a tribe "obtain review of a historical land claim otherwise barred by the Act by challenging present-day actions involving the land." Id.
If it later appears that the Tribe has artfully pleaded its claims against the State of Michigan to litigate-by-proxy a claim against the United States, the Court will revisit the statutory bar imposed by the ICCA.