# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1257

_____

Mille Lacs Band of Ojibwe, et al.

*Plaintiffs - Appellees*

v.

Erica Madore, in her official capacity as County Attorney

*Defendant - Appellant*

Joseph J. Walsh;  Kyle Burton; County of Mille Lacs, Minnesota

*Defendants*

------------------------------

Mille Lacs Equal Rights Foundation; Proper Economic Resource Management

*Amici on Behalf of Appellant(s)*

United States; State of Minnesota; Leech Lake Band of Ojibwe;
The Bois Forte Band and of Chippewa; Grand Portage Band of Lake Superior
Chippewa; National Congress of American Indians

*Amici on Behalf of Appellee(s)*

_____

No. 23-1261
_____

Mille Lacs Band of Ojibwe et al.

*Plaintiffs - Appellees*

v.

County of Mille Lacs, Minnesota

*Defendant - Appellant*

Joseph J. Walsh; Erica Madore; Kyle Burton

*Defendants*

------------------------------

City of Wahkon; Kathio Township; South Harbor Township;
Isle Harbor Township; Mille Lacs Equal Rights Foundation;
Proper Economic Resource Management

*Amici on Behalf of Appellant(s)*

United States; State of Minnesota; Leech Lake Band of Ojibwe;
The Bois Forte Band of Chippewa; Grand Portage Band of Lake Superior
Chippewa; National Congress of American Indians

*Amici on Behalf of Appellee(s)*
_____

-2-

_____

No. 23-1265
_____

Mille Lacs Band of Ojibwe, et al.

*Plaintiffs - Appellees*

v.

Kyle Burton

*Defendant - Appellant*

County of Mille Lacs, Minnesota; Joseph J. Walsh; Erica Madore

*Defendants*

------------------------------

Mille Lacs Equal Rights Foundation; Proper Economic Resource Management

*Amici on Behalf of Appellant(s)*

United States; State of Minnesota; Leech Lake Band of Ojibwe;
The Bois Forte Band of Chippewa; Grand Portage Band of Lake Superior
Chippewa; National Congress of American Indians

*Amici on Behalf of Appellee(s)*
_____

Appeals from United States District Court
for the District of Minnesota
_____

Submitted: June 12, 2024
Filed: February 12, 2025
_____

Before LOKEN, ERICKSON, and GRASZ, Circuit Judges.
_____

LOKEN, Circuit Judge.

In Article I of the Treaty with the Chippewa, 1855, 10 Stat. 1165 (the "1855 Treaty"), between the United States and bands of the Chippewa Indians,[1] the bands agreed to "cede, sell, and convey to the United States all their right, title, and interest in, and to, the lands now owned and claimed by them, in the Territory of Minnesota, and included within the following boundaries." In Article 2, the Treaty "reserved and set apart [in separate tracts], a sufficient quantity of [precisely defined] land for the permanent homes of the said Indians," setting apart nine reservations from the ceded territory for Chippewa bands that signed the Treaty. The lands set apart for the Mille Lacs Band of Ojibwe (the "Band"), a federally recognized tribe,[2] consisted of more

_____

[1]The Treaty's full text can be found at 1855 WL 10423 (Trty.). Like other treaties with Indian tribes, the 1855 Treaty was an exercise of the President's power in Article II, Section 2 of the Constitution, "with the Advice and Consent of the Senate, to make Treaties." In the Act of Mar. 3, 1871, ch. 120, 16 Stat. 544, 566 (codified at 25 U.S.C. § 71), Congress discontinued the practice of contracting with Indian tribes "by treaty" but provided that "no obligation of any treaty lawfully made and ratified . . . prior to March 3, 1871, shall be hereby invalidated or impaired." See generally Cohen's Handbook of Federal Indian Law § 5.01[2] (Nell Jessup Newton ed., 2012).

[2]The Band is one of the six Mississippi bands of Chippewa that were parties to the 1855 Treaty. Today, the Chippewa refer to themselves as "Ojibwe," the tribe's original name from which "Chippewa" derived. The tribe and its bands were commonly referred to as the Chippewa during the period here at issue, and we will for the most part use that name throughout this opinion. Any references to the Ojibwe should be considered synonymous.

than 61,000 acres along Lake Mille Lacs in Minnesota, creating what has since been called the Mille Lacs Reservation (the "Reservation"). In Article 3, the United States agreed to make payments and provide goods "[i]n consideration of, and in full compensation for, the cessions made by the said . . . bands of Chippewa Indians, in the first article of this agreement."

This case concerns the respective law enforcement rights and obligations of the Band's tribal officers and Mille Lacs County law enforcement officers to enforce federal, state, and tribal laws in that portion of the Reservation that lies in Mille Lacs County, Minnesota. The Band and two tribal officers filed this lawsuit in 2017 against Mille Lacs County, the County Attorney, and the County Sheriff, seeking declaratory and injunctive relief to remedy alleged interference with the Band's inherent law enforcement authority, contrary to federal law. Plaintiffs asked the district court to declare that the Band has the inherent authority to establish a police force and to authorize its officers to investigate violations of federal, state, and tribal law within the original boundaries of the Reservation and to apprehend suspects and turn them over to the proper prosecutorial authority. Plaintiffs also sought a declaration that the Band's federally-delegated law enforcement authority permits individual Band officers to investigate violations of federal law and arrest suspects within the Reservation's original boundaries. In their answer, Defendants asserted, among other defenses, that the Reservation was "disestablished" as a matter of federal Indian law more than 100 years ago.

The district court addressed the merits of the dispute in two lengthy orders. First, in a Memorandum Opinion and Order dated March 4, 2022, the court granted the Band partial summary judgment, "affirm[ing] what the Band has maintained for the better part of two centuries -- the Mille Lacs Reservation's boundaries remain as they were under Article 2 of the Treaty of 1855." Mille Lacs Band of Ojibwe v. Cnty. of Mille Lacs, 589 F. Supp. 3d 1042, 1096 (D. Minn. 2022). Subsequent treaties and federal statutes did not disestablish the Reservation, the court concluded. Second, in

an Order on Cross-Motions for Summary Judgment dated January 10, 2023, the court granted the Band's request for declaratory relief, declaring (i) the Band "possesses inherent sovereign law enforcement authority within the . . . Reservation as established in Article 2" of the 1855 Treaty, including "the authority of Band police officers to investigate violations of federal, state, and tribal law," and (ii) federal statutes and administrative actions give tribal officers "federal authority to investigate violations of applicable federal law" within the Reservation. Mille Lacs Band of Ojibwe v. Cnty. of Mille Lacs, 650 F. Supp. 3d 690, 730-31 (D. Minn. 2023). Because the Band sought no damages for interference, the court ruled it could award the declaratory relief the plaintiffs sought without considering evidence of specific instances of interference.

The County defendants appeal these rulings and the grant of summary judgment in favor of the Band in three consolidated appeals, raising a host of recurring tribal sovereignty issues. The Band has moved to dismiss the appeals, arguing that an amendment to the applicable Minnesota statute, effective July 1, 2023, mooted the appeals. Addressing only those issues needed to resolve the appeals, we conclude for the reasons that follow that the appeals are moot and that the district court orders being appealed should be vacated. We remand for further proceedings not inconsistent with this opinion.

## I. How The Dispute Arose

Under federal law, Indian tribal officers and Minnesota law enforcement officers have overlapping criminal jurisdiction over crimes committed in Indian country.[3] An Indian tribe may employ police officers to aid in the enforcement of

---

[3]Under federal law, "Indian country" is defined as: "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way

tribal law and in the exercise of tribal power.  See 25 U.S.C. § 13.  Though tribes no longer possess full sovereignty, their powers of self-government include "the inherent power . . . to exercise criminal jurisdiction over all Indians," including nonmembers. 25 U.S.C. § 1301(2); see United States v. Lara, 541 U.S. 193, 197-98 (2004).  The Band's law enforcement authority includes the right of tribal officers to investigate violations of federal or state law by a non-Indian on the Reservation and to detain the suspect until he or she is turned over to a jurisdiction with prosecutorial authority. See United States v. Cooley, 593 U.S. 345, 349-53 (2021).

In § 2(a) of Public Law 280,[4] Congress granted Minnesota "broad criminal jurisdiction over offenses committed by or against Indians within all Indian country within the State," except the Red Lake Reservation.  California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207 (1987); see Walker v. Rushing, 898 F.2d 672, 673 (8th Cir. 1990).  Minnesota "was one of the so-called 'mandatory' states which was authorized to exercise jurisdiction without the need for further legislative steps." Id. at 673 n.4.

When this lawsuit was filed, subdivision 2(a) of Minnesota Statute § 626.90, first enacted in 1991, expressly permitted the Mille Lacs Band of Chippewa to exercise "the powers of a law enforcement agency" under state law if four requirements are met:

---

running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."  18 U.S.C. § 1151.

[4]Act of Aug. 15, 1953, ch. 505, § 2(a), 67 Stat. 588, 588, codified at 18 U.S.C. § 1162(a).

(1) the band agrees to be subject to liability for its torts and those of its officers, employees, and agents acting within the scope of their employment or duties arising out of a law enforcement agency function conferred by this section, to the same extent as a municipality under chapter 466, and the band further agrees, notwithstanding section 16C.05, subdivision 7, to waive its sovereign immunity for purposes of claims of this liability;

(2) the band files with the Board of Peace Officer Standards and Training a bond or certificate of insurance for liability coverage with the maximum single occurrence amounts set forth in section 466.04 and an annual cap for all occurrences within a year of three times the single occurrence amount;

(3) the band files with the Board of Peace Officer Standards and Training a certificate of insurance for liability of its law enforcement officers, employees, and agents for lawsuits under the United States Constitution; and

(4) the band agrees to be subject to section 13.82 and any other laws of the state relating to data practices of law enforcement agencies.

A prerequisite to exercising this authority was that "[t]he band *shall* enter into mutual aid/cooperative agreements with the Mille Lacs County sheriff under section 471.59 to define and regulate the provision of law enforcement services under this section." Minn. Stat. § 626.90, subd. (2)(b) (2022) (emphasis added).

In 2008, the Band and the County entered into a cooperative agreement that satisfied subdivision (2)(b), giving the Band and the County Sheriff concurrent state law enforcement jurisdiction:

(1) over all persons in the geographical boundaries of the property held by the United States in trust for the Mille Lacs Band or Minnesota Chippewa tribe;

(2) over all Minnesota Chippewa tribal members within the boundaries of the Treaty of February 22, 1855, 10 Stat. 1165, in Mille Lacs County, Minnesota; and

(3) concurrent jurisdiction over any person who commits or attempts to commit a crime in the presence of an appointed band peace officer within the boundaries of the Treaty of February 22, 1855, 10 Stat. 1165, in Mille Lacs County, Minnesota.

Id. § 626.90, subd. (2)(c).

In 2013, the Band applied to the United States Department of Justice to obtain jurisdiction over crimes committed within the Band's "Indian country" under the Tribal Law and Order Act ("TLOA"), 18 U.S.C. § 1162(d), jurisdiction which is concurrent among federal, state, and applicable tribal governments, depending on the offense and offender. See 18 U.S.C. §§ 1152-1153. The County opposed the application, arguing the Reservation has been disestablished and therefore the 1855 Treaty borders do not constitute "Indian country." The Band responded that the 1855 Treaty boundaries remain intact. In November 2015, the Solicitor of the Interior issued a 37-page opinion finding no clear congressional intent to disestablish the Reservation sufficient to overcome the general rule that "doubtful expressions are to be resolved in favor of the [Indians]," citing DeCoteau v. Dist. Cnty. Ct. for Tenth Jud. Dist., 420 U.S. 425, 444 (1975). Therefore, according to the Solicitor of the Interior's opinion, the Reservation's 1855 boundaries remain intact. U.S. Dep't of the Interior, Solicitor's Opinion M-37032, Opinion on the Boundaries of the Mille Lacs Reservation (Nov. 20, 2015).

In response, the County passed a resolution revoking its 2008 cooperative law enforcement agreement with the Band, upon thirty days notice to the Band and the County Sheriff. County Attorney Joseph Walsh asked the Minnesota Attorney General for an opinion as to the scope of the Band's law enforcement authority if the cooperative agreement was not in effect. The Attorney General declined to opine,

-9-

advising Walsh to give the County the guidance Walsh deemed appropriate. On July 18, 2016, just before the cooperative agreement would expire, the County issued a 15-page document signed by Walsh titled "Mille Lacs County Attorney's Office Opinion on the Mille Lacs Band's Law Enforcement Authority" (the "Opinion"). The Opinion's stated primary purpose "is to avoid encounters between law enforcement officers in the field."

The Opinion first stated that Minnesota Statute § 626.90 "only allowed the Band to *provide law enforcement services* within Mille Lacs County if [it] entered into a mutual aid/cooperative agreement with the Mille Lacs County Sheriff." (Emphasis in original.) Therefore, "[t]he Mille Lacs Band police department no longer has lawful state law jurisdiction within Mille Lacs County unless and until a new cooperative agreement pursuant to Minn. Stat. § 626.90 is reached."

The Opinion then addressed the Band's law enforcement authority in Mille Lacs County absent a cooperative agreement -- Band officers will have more limited powers to make criminal and citizens arrests, issue citations, perform investigations, sign criminal complaints and obtain search warrants from state courts, carry firearms, and use force and deadly force. The Opinion stated that Band officers risked criminal liability for unauthorized practice of law enforcement authority and for obstructing or interfering with a peace officer if they exceed the scope of their authority in the absence of a cooperative agreement.

Turning to the scope of the Band's *inherent* tribal jurisdiction, the Opinion stated that the Supreme Court "has never determined the scope of retained inherent tribal jurisdiction over criminal matters," and federal courts "have only tangentially addressed the issue." The Opinion continues:

While the state of the law is anything but clear, a review of available federal and Minnesota case law reveals a few conclusions that may be tentatively reached (pending future clarification):

(1) The Mille Lacs Band of Ojibwe may retain inherent criminal jurisdiction over Mille Lacs Band of Ojibwe members and may also have inherent criminal jurisdiction over members of other Indian tribes and bands on tribal trust lands, but not for "major crimes" or felony offenses;

(2) The Mille Lacs Band of Ojibwe has exclusive jurisdiction over members of the Mille Lacs Band of Ojibwe in civil regulatory cases arising in "Indian country;"

(3) Criminal jurisdiction by tribes does **not** extend to non-Indians (with one narrow potential exception under the Violence Against Women Act);

(4) Inherent tribal jurisdiction is limited to "Indian country." Indian country includes land held in trust and land within an Indian Reservation. The Mille Lacs Band and the State of Minnesota including Mille Lacs County differ on the extent of "Indian country" in Mille Lacs County. The State and County believe that "Indian country" in Mille Lacs County is limited to tribal trust lands.

(5) The State of Minnesota has criminal jurisdiction over all criminal/prohibitory offenses committed by Indians anywhere in the State of Minnesota;

(6) The State of Minnesota has civil/regulatory jurisdiction over Indians who are not on their own reservation or own tribe's trust land.

At County Sheriff Brent Lindgren's request, the County also released the "Northern Mille Lacs County Protocol." The Protocol began by stating: "*Mille Lacs County's position is that inherent tribal criminal authority doesn't extend (1) outside of trust lands or (2) to non-members of the Mille Lacs Band.*" (Emphasis in original.) The Protocol stated that the Band's officers "have significant powers of <u>arrest</u> as outlined below, but must turn over arrested persons without delay to a Mille Lacs

-11-

County peace officer so an <u>investigation</u> admissible in state court may be conducted." (Emphasis in original.) The Protocol then set forth a lengthy list of law enforcement actions that Band officers may and may not "lawfully" exercise.

At his deposition, County Attorney Walsh testified that violations of the Opinion and Protocol could violate state criminal law and he would have discretion to prosecute. Sheriff Lindgren "instructed [his] staff and deputies to follow the County Attorney's Opinion and Protocol." Assistant County Attorney Kali Gardner testified that "other officers were advised that they could arrest tribal police officers if they [violated the Opinion and Protocol]." Though no Band officers were arrested, the Band's Deputy Police Chief testified that Band officers feared "getting arrested for impersonating officers" and therefore followed the Opinion and Protocol.

After revocation of the cooperative agreement, the Band entered into a TLOA Deputation Agreement with the Bureau of Indians Affairs ("BIA") in December 2016. The BIA issued Special Law Enforcement Commissions ("SLECs") to qualifying Band officers authorizing them to assist BIA officers in enforcing federal laws applicable within "Indian Country," including the power "to make lawful arrests." The Deputation Agreement provides that "[l]awful actions pursuant to this federal Agreement and a commission issued under it supersede any contrary Tribal, State, or local law, ordinance, or practice." County Attorney Walsh declared that SLEC officers could only exercise their federal law enforcement authority on trust lands,[5] not on all lands within the Reservation's 1855 boundaries.

_____

[5]The term "trust lands" in federal Indian law means lands purchased by the Secretary of the Interior under § 5 of the Indian Reorganization Act of 1934, title to which is "taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired." Indian Reorganization Act of 1934, ch. 576, § 5, 48 Stat. 984, 985 (codified at 25 U.S.C. § 465, later transferred to § 5108); see <u>Yankton Sioux Tribe v. Podhradsky</u>, 606 F.3d 994, 1010-13 (8th Cir. 2010), <u>cert. denied</u>, 564 U.S. 1019 (2011).

After the Band filed this lawsuit, the Band and the County entered into a temporary cooperative law enforcement agreement in 2018 restoring the Band's concurrent jurisdiction with the County Sheriff under state law. Though still in effect today, it will terminate ninety days after the final resolution of this lawsuit.

## II. Is the Dispute Now Moot?

Section 626.90 of the Minnesota Statutes defines the Band's concurrent jurisdictional authority with the Mille Lacs County Sheriff's Department under state law. While this appeal was pending, the Minnesota Legislature amended the statute in two critical respects. First, when the County issued the Opinion and Protocol, the statute provided that, to gain concurrent authority, the Band "shall enter into mutual aid/cooperative agreements with the Mille Lacs County sheriff." Minn. Stat. § 626.90, subd. 2(b) (2022). The amended statute changes the word "shall" to "may." Minn. Stat. § 626.90, subd. 2(b) (Supp. 2023).[6] Second, the former statute granted the Band more limited law enforcement jurisdiction over non-Band members. § 626.90, subd. 2(c)(1) (2022). The amended statute gives the Band unqualified law enforcement jurisdiction "over all persons in the geographical boundaries of the Treaty of February 22, 1855 . . . in Mille Lacs County, Minnesota." § 626.90, subd. 2(c) (Supp. 2023).

The Band argues these changes moot the appeal because they eliminate Defendants' argument that the Band lost its state law enforcement authority under § 626.90 when the County revoked the cooperative agreement. The amended statute grants the Band unqualified law enforcement jurisdiction over all persons within the Reservation's 1855 boundaries, and the Band meets the § 626.90, subd. 2(a)

---

[6]Under Minnesota law, in construing the language of a statutory revision, "an amendment substituting 'may' for 'shall' manifests a clear intent to make the act referred to optional and permissive instead of mandatory." Champ v. Brown, 266 N.W. 94, 97 (Minn. 1936); see Minn. Stat. § 645.44, subds. 15, 16.

-13-

requirements to exercise this authority. Thus, the concurrent law enforcement authority dispute under state law is now resolved.

Defendants oppose the Band's motion to dismiss the appeals as moot. They argue first that we should defer ruling on mootness until we decide two threshold jurisdictional issues Defendants raise on appeal -- that we lack federal question jurisdiction under 28 U.S.C. § 1331, and that we lack statutory jurisdiction because the Band's claims are barred by the Indian Claims Commission Act. The short answer to this contention is, "there is no mandatory sequencing of jurisdictional issues." Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007) (quotation omitted). The short answer might not be sufficient in some cases where mootness-on-appeal "competes with" lack of subject matter jurisdiction. But that is not of concern in this case because Defendants' jurisdictional arguments are without merit.

First, the district court and this court plainly have federal question jurisdiction because the Band's claims arise under federal common law.[7] See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians, 471 U.S. 845, 850-53 (1985); Cnty. of Oneida v. Oneida Indian Nation, 470 U.S. 226, 233-36 (1985); Illinois v. City of Milwaukee, 406 U.S. 91, 100 (1972); Bishop Paiute Tribe v. Inyo Cnty., 863 F.3d 1144, 1152 (9th Cir. 2017). Defendant Madore's contention that TLOA displaced federal common law without saying so is without merit.

Second, Defendants contend that the Band's claims are barred by the statute of limitations in the Indian Claims Commission Act of 1946, ch. 959, 60 Stat. 1049,

---

[7]In addition to federal question jurisdiction under § 1331, 28 U.S.C. § 1362 provides that "[t]he district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States."

-14-

codified at 25 U.S.C. § 70, which expired by its own terms in 1978.  But this is an affirmative defense, not an issue of statutory jurisdiction.  See Sokaogon Chippewa Cmty. v. Wisconsin, 879 F.2d 300, 302-03 (7th Cir. 1989); Mille Lacs Band of Chippewa Indians v. Minnesota, 853 F. Supp. 1118, 1138-39 (D. Minn. 1994); cf. Oglala Sioux Tribe of Pine Ridge Indian Rsrv. v. U.S. Amy Corps of Eng'rs, 570 F.3d 327, 333 (D.C. Cir. 2009).

On the merits of the mootness issue, Defendants do not assert they will reimpose the restrictions set forth in the Opinion and Protocol or otherwise interfere with the Band's law enforcement authority under amended § 626.90.  Rather, they argue that amended § 626.90 does not directly resolve the parties' disagreements over other issues raised during the course of this protracted litigation, such as the scope of the Band's inherent law enforcement authority and whether the Reservation has been disestablished.

"When the issues presented in a case are no longer live, the case is moot and is therefore no longer a 'Case' or 'Controversy' for purposes of Article III."  Whitfield v. Thurston, 3 F.4th 1045, 1047 (8th Cir. 2021) (quotation omitted).  "Generally, a claim is moot when changed circumstances already provide the requested relief and eliminate the need for court action."  Hillesheim v. Holiday Stationstores, Inc., 903 F.3d 786, 791 (8th Cir. 2018) (quotation omitted).

A case becomes moot "when the requisite personal interest that gave the plaintiff standing to bring the suit disappears as the case proceeds."  Whitfield, 3 F.4th at 1047 (quotation omitted).  Here, seeking to end the County's alleged interference with its law enforcement authority under state law, the Band requested a declaration that "[a]s a matter of federal law, the Band possesses inherent sovereign authority to establish a police department and to authorize Band police offices to investigate violations of federal, state, and tribal law within the Mille Lacs Reservation as established in Article 2 of the [1855 Treaty]."  Under amended

-15-

§ 626.90, as the Band is meeting the statute's express conditions, which is undisputed, tribal officers have unqualified law enforcement authority, concurrent with that of the Mille Lacs County sheriff's deputies, over all persons within those Reservation boundaries, whether or not the Reservation has been disestablished under federal law. § 626.90, subd. 2(c).

The Minnesota Legislature has now granted the Band full law enforcement authority under state law, and the County Opinion and Protocol are no longer in force. "[A]n appeal must be dismissed as moot when our decision will have no effectual relief whatever to a prevailing party." Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 621 (8th Cir. 2002) (en banc) (quotation omitted). A declaration that tribal officers also have inherent sovereign authority to enforce state law would answer what is now a hypothetical legal question -- the Band has consistently conceded that its inherent sovereign authority is narrower than the concurrent state law authority it litigated to establish, which is now provided by amended § 626.90. The Band also sought a declaration that under federal law, the Deputation Agreement between the Band and the BIA and the SLECs issued by the BIA give the Band's police officers authority to investigate violations of federal law within Reservation boundaries as established by the 1855 Treaty. This is no longer a justiciable case or controversy -- the United States filed an amicus brief supporting the district court's grant of this declaratory relief. A declaratory judgment "may not be made the medium for securing an advisory opinion in a controversy which has not arisen." Coffman v. Breeze Corp., 323 U.S. 316, 324 (1945).

The Minnesota Legislature has given the Band the law enforcement authority it sought (and more) through amended § 626.90. See McCarthy v. Ozark Sch. Dist., 359 F.3d 1029, 1035-36 (8th Cir. 2004). "The requirement that the plaintiff's injury be redressable by a favorable resolution of his claim 'subsists through all stages of federal judicial proceedings, trial and appellate.'" Sisney v. Kaemingk, 15 F.4th 1181, 1196 n.5 (8th Cir. 2021), quoting Spencer v. Kemna, 523 U.S. 1, 7 (1998).

-16-

Under amended § 626.90, Defendants can no longer inflict the injury that gave the Band standing to bring this lawsuit. The primary issue presented, the one that made this a justiciable case or controversy, is no longer live. That other issues raised by the parties are not resolved does not give us Article III jurisdiction to render an advisory opinion now that the case or controversy underlying the appeal is moot.

Defendants ague that the voluntary cessation exception to mootness applies, relying on City of Erie v. Pap's A.M., 529 U.S. 277 (2000). Our standard for applying this exception is "stringent." McCarthy, 359 F.3d at 1037 (quotation omitted). In Pap's, a nude dancing establishment obtained an injunction preventing the city from enforcing its public nudity ordinance. The city appealed. Plaintiff ceased operation as a nude dancing establishment and argued the city's pending appeal was moot. Pap's, 529 U.S. at 287. The Supreme Court held the appeal was not moot because the plaintiff retained an interest in preserving the lower court's judgment if it resumed nude dancing operations, and because the Court has an "interest in preventing litigants from attempting to manipulate the Court's jurisdiction to insulate a favorable decision from review." Id. at 288.

This case is distinguishable. The Band has not changed its practices to moot the case to avoid appellate review. The Band exercised concurrent authority under § 626.90 for many years until the County revoked the required cooperative agreement. In 2018, after the case was filed, the Band resumed exercising § 626.90 authority under a temporary cooperative agreement with the County. Due to intervention by the state legislature, which is not a party to the lawsuit, the Band can exercise authority under amended § 626.90 when the temporary agreement expires. Though the Band supported the proposed amendment, it has not attempted "to manipulate the Court's jurisdiction to insulate a favorable decision from review."

Defendants further argue that another mootness exception applies: "When a law has been amended or repealed, actions seeking declaratory or injunctive relief for

-17-

earlier versions are generally moot *unless the problems are capable of repetition yet evad[ing] review.*" Phelps-Roper v. City of Manchester, 697 F.3d 678, 687 (8th Cir. 2012) (en banc) (emphasis added) (quotation omitted). This exception does not apply unless there exists "a reasonable expectation that the same complaining party will be subject to the same action again." McCarthy, 359 F.3d at 1036 (quotation omitted). Here, it is entirely speculative that the Band will face the same County interference in the future now that § 626.90 has been amended and the Opinion and Protocol are no longer in force. Defendants posit that the Band at any time may stop meeting the remaining conditions of § 626.90. But there is no reasonable expectation that the Band, after litigating to establish the state law enforcement authority amended § 626.90 now provides, would abandon this delegated authority and rely only on its inherent and federally-delegated authority. "A speculative possibility is not a basis for retaining jurisdiction over a moot case." Id.

### III. The Appropriate Mootness Remedy

The parties disagree whether we should vacate the district court's orders being appealed if we decide the appeal is moot. "This is our normal practice when a civil case becomes moot pending appellate adjudication, as doing so clears the path for future relitigation by eliminating a judgment the loser was stopped from opposing on direct review." Moore v. Thurston, 928 F.3d 753, 758 (8th Cir. 2019) (quotation omitted). See generally United States v. Munsingwear, Inc., 340 U.S. 36 (1950). As the Supreme Court recently confirmed, "[o]ur Munsingwear practice [to order vacatur] is well settled." Acheson Hotels, LLC v. Laufer, 601 U.S. 1, 5 (2023). But vacatur is an equitable remedy, not an automatic right. And because vacatur is "rooted in equity, the decision whether to vacate turns on the conditions and circumstances of the particular case." Azar v. Garza, 584 U.S. 726, 729 (2018) (quotation omitted).

-18-

"Vacatur is in order when mootness occurs through happenstance -- circumstances not attributable to the parties . . . ." Arizonans for Off. Eng. v. Arizona, 520 U.S. 43, 71 (1997). Happenstance has made this appeal moot. The action of a third party, the Minnesota Legislature, in amending § 626.90 superseded the County Opinion and Protocol, leaving it merely speculative that the County would ever reimpose the challenged restrictions on the Band's law enforcement authority if this case ends without a ruling on the merits of the orders being appealed. Legislation is generally an "intervening, independent event [that favors vacatur] and not voluntary action." Moore, 928 F.3d at 758 (quotation omitted).

"As always when federal courts contemplate equitable relief, [they] must also take account of the public interest." U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship, 513 U.S. 18, 26 (1994). In SD Voice v. Noem, for example, we held that the public interest defeated vacatur because the district court judgment "works to protect . . . core political speech where First Amendment protection is at its zenith." 987 F.3d 1186, 1190-91 (8th Cir. 2021) (cleaned up) (quotation omitted). Here, by contrast, we conclude the public interest supports vacatur.

The district court orders hold that the Reservation was not disestablished by subsequent treaties and acts of Congress and therefore remains extant, with the boundaries established by the 1855 Treaty. This issue has been hotly contested but never resolved in the Band's favor for approximately 150 years. The district court said this important issue is "[a]n integral part of the parties' dispute . . . now presented to the Court on the parties' Cross-Motions for Summary Judgment." No doubt the issue was "integral" to the dispute the parties attempted to present, but its resolution was not necessary to decide whether the Band then had concurrent law enforcement authority as a matter of federal Indian law and the Band's inherent tribal sovereignty, absent a mutual aid/cooperative agreement with the County under Minnesota Statute § 626.90. In effect, both parties sought an advisory opinion on a question of great public interest along with the "live" case or controversy they presented.

Defendants oppose the Band's request that the district court orders not be vacated, arguing the court's decision regarding the Reservation's status creates uncertainty as to criminal offenses, see 18 U.S.C. § 1153, and federal regulatory authority, and may impact longstanding expectations of County residents whether their homes and businesses are within Indian country. The validity of these concerns is illustrated by the competing views as to impact and public interest in the majority and dissenting opinions in two recent Supreme Court opinions holding that the large Creek Nation Reservation that includes Tulsa, Oklahoma has not been disestablished, McGirt v. Oklahoma, 591 U.S. 894 (2020), and Oklahoma v. Castro-Huerta, 597 U.S. 629 (2022).

Before this appeal became moot, the decision regarding disestablishment was subject to appellate review. Now, it is not, but the Band still wants the benefit of what is now an advisory opinion. A major problem with not vacating the district court's decision is that the court (and the Solicitor of the Interior) misconstrued (in our view) two decisions of the Supreme Court, as we will next explain. It is not the province of an agency official and a lower federal court to construe Supreme Court opinions in a manner not subject to appellate review. In these circumstances, the proper answer to a question of remedy that is "rooted in equity" is to follow "Munsingwear practice" and vacate the district court's orders. This leaves the disestablishment question to be decided in a live case or controversy.

## IV. The Disestablishment Issue

Whether the Reservation has been disestablished is a difficult question requiring an understanding of its complex history following the signing of the 1855 Treaty. Defendants argue the Reservation was disestablished by treaties between the United States and the Band in 1863, 1864, and 1867; by the Nelson Act of 1889, ch. 24, § 1, 25 Stat. 642, 642 (the "Nelson Act"); by the agreement in which the Band

accepted that Act; by the Act of May 27, 1902, ch. 888, § 1, 32 Stat. 245, 268; and by an agreement in which the Band consented to that Act.

**A. The Legal Framework.**  "Whether an act of Congress diminished or disestablished an Indian reservation is a question of statutory interpretation we review *de novo*."  United States v. Jackson, 853 F.3d 436, 438 (8th Cir. 2017).  "The framework we employ to determine [this issue] is well settled."  Nebraska v. Parker, 577 U.S. 481, 487 (2016).  Only Congress can disestablish a reservation, "and its intent to do so must be clear."  Id. at 487-88.  "Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise."  Solem v. Bartlett, 465 U.S. 463, 470 (1984).  "To determine whether a tribe continues to hold a reservation, there is only one place we may look: the Acts of Congress."  McGirt, 591 U.S. at 903.  The Court explained:

> History shows that Congress knows how to withdraw a reservation when it can muster the will.  Sometimes, legislation has provided an "explicit reference to cession" or an "unconditional commitment to compensate the Indian tribe for its opened land."  Other times, Congress has directed that tribal lands shall be "restored to the public domain."  Likewise, Congress might speak of a reservation as being "discontinued," "abolished," or "vacated."  Disestablishment has never required any particular form of words.  But it does require that Congress clearly express its intent to do so, commonly with an explicit reference to cession or other language evidencing the present and total surrender of all tribal interests.

Id. at 904 (cleaned up).

**B. The 1863 Treaty.**  After an uprising by Dakota Sioux Indians in 1862, the government sought to remove six Mississippi Chippewa bands to a reservation near Leech Lake, Minnesota to avoid further conflict with white settlers.  Chief

Shaboshkung of the Mille Lacs Band, who signed the 1855 Treaty,[8] refused to cede the Reservation. On March 6, 1863, Senator Henry Rice of Minnesota negotiated with the Chippewa delegates in private sessions. Senator Rice drafted a treaty that the Chippewa delegates including Chief Shaboshkung signed on March 11, 1863 (the "1863 Treaty").[9] Article I of the 1863 Treaty provided: "The reservations known as Gull Lake, Mille Lac, Sandy Lake, Rabbit Lake, Pokagomin Lake, and Rice Lake, as described in the . . . second article of the [1855 Treaty] are hereby ceded to the United States." Article II set apart as "future homes of the Chippewas of the Mississippi, all the lands embraced within the following described boundaries," establishing a new reservation at Leech Lake. In Articles III through VI, the United States agreed to make payments, clear land, furnish oxen and farm equipment, and move a sawmill to the new reservation "[i]n consideration of the foregoing cession to the United States, and the valuable improvements thereon." Article XII, dealing with when Indians party to the Treaty were obligated to "remove from their present reservations," included an important proviso:

> *Provided*, That, owing to the heretofore good conduct of the Mille Lacs Indians [in protecting Fort Ripley during the uprising], they shall not be compelled to remove so long as they shall not in any way interfere with or in any way molest the persons or property of the whites.

After signing the 1863 Treaty, the Band's delegates met with President Abraham Lincoln who told them they could remain in their present location forever as long as they were friendly to the whites and well-behaved.

---

[8]Spelled "SHOB-OSH-KUNK" in the signature portion of the treaty.

[9]The text of the 1863 Treaty, 12 Stat. 1249, can be found at 1863 WL 6279 (U.S. Treaty).

**C. The 1864 Treaty.**  In response to Indian complaints, two Chippewa representatives traveled to Washington to renegotiate the 1863 Treaty.  A new superseding treaty was signed on May 7, 1864 (the "1864 Treaty").[10]  The Leech Lake Reservation was expanded, but in other relevant respects, the two treaties were identical.  Article 12 retained the proviso in Article XII of the 1863 Treaty that the Band "shall not be compelled to remove so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites."  A treaty ratified in 1865 further enlarged the Leech Lake Reservation.

**D. The 1867 Treaty.**  Issues at Leech Lake soon prompted further negotiations. A new treaty was signed on March 19, 1867.[11]  Article I provided that the Mississippi Chippewa bands "hereby cede to the United States all their lands in the State of Minnesota, secured to them by the second article of their treaty of March 20th, 1865," except a specified portion of the Leech Lake Reservation.  In consideration for the cessions, Article II set apart a tract "to provide a suitable farming region for the said bands," creating a new reservation that became known as the White Earth Reservation.  In further consideration, the United States agreed in Article III to make payments to erect and support school buildings and a grist mill on the new reservation, to assist erecting houses for Indians who removed, to purchase cattle and farming utensils, and to make improvements necessary for opening farms on the new reservation.

**E. The Nelson Act and Agreement.**  Following the 1860s treaties, white settlers and government officials attempted to remove the Band from the Reservation,

---

[10]Treaty with the Chippewa, Mississippi, and Pillager and Lake Winnibigoshish Bands, 1864, 13 Stat. 693.  The text can be found at 1864 WL 11699 (Trty.).

[11]Treaty Between the United States of America and the Chippewa Indians of the Mississippi, 16 Stat. 719 (ratified with amendments Apr. 8, 1867).  The text is found at 1867 WL 10243 (U.S. Treaty).

lumbermen entered the Reservation and cut valuable pine timber, and a local land office opened the Reservation to public entry. Commissioner of Indian Affairs Ely Parker instructed the General Land Office that the Reservation had not been opened to entry and the Band was not yet subject to removal. For two decades, the Reservation remained officially closed to public entry.

In 1875, a Mille Lacs delegation led by Chief Shaboshkung met with Commissioner of Indian Affairs Edward Smith, seeking assistance in developing the Reservation. Smith instead urged Band members to move to White Earth. In 1876, Secretary of the Interior Zachariah Chandler ordered the Reservation opened to entry but suspended the order until the end of the next session of Congress. Congress took no action during the following session. In the Act of July 4, 1884, ch. 180, § 1, 23 Stat. 76, 89, Congress declared: "[T]he lands acquired from the [Band by the Treaty of 1864] shall not be patented or disposed of in any manner until further legislation by Congress."

In May 1886, Congress authorized the Secretary of the Interior to "negotiate with the several tribes and bands of Chippewa Indians in the State of Minnesota for such modification of existing treaties with said Indians and such change of their reservation as may be deemed desirable by said Indians and the Secretary of the Interior." Act of May 15, 1886, ch. 333, § 1, 24 Stat. 29, 44. The Secretary appointed a Commission that reached agreements with other bands to consolidate at White Earth. The Band refused to relocate and in 1888 petitioned the government to grant individual allotments at Mille Lacs, reiterating its desire to stay there.

In March 1888, the House Committee on Indian Affairs recommended that the Chippewa be removed to and consolidated at White Earth, where they would receive allotments. See H.R. Rep. No. 50-789, at 1 (1888). The report included a proposed bill for the sale of reservation lands and the establishment of a "permanent interest-bearing fund for all the Chippewa Indians in common." Id. at 6. A House floor

amendment allowed the Indians the option of taking allotments on their existing reservations instead of at White Earth.  19 Cong. Rec. 1887-88 (1888).

Congress passed the Nelson Act in January 1889.  Section 1 directed the President to appoint a commission "to negotiate with all the different bands or tribes . . . for the complete cession and relinquishment in writing of all their title and interest in and to all the reservations of said Indians in the State of Minnesota, except the White Earth and Red Lake Reservations . . .  upon the terms hereinafter stated."  It provided that "the acceptance and approval of such cession and relinquishment by the President of the United States shall, be deemed full and ample proof of the assent of the Indians, and shall operate as a complete extinguishment of Indian title . . . ."  Nelson Act § 1, 25 Stat. at 642.  Section 3 provided that, after the cessions were approved and ratified, all Minnesota Chippewa except those at Red Lake would be removed to and given allotments at White Earth:

> *Provided further*, That any of the Indians residing on any of said reservations may, in his discretion, take his allotment in severalty under this act on the reservation where he lives at the time of the removal herein provided for is effected, instead of being removed to and taking such allotment on White Earth Reservation.

Id. § 3, 25 Stat. at 643.  Sections 4-6 categorized the ceded lands as "pine lands" or "agricultural lands," provided how the pine lands would be sold, and stated that unallotted agricultural lands would be disposed of under the homestead laws.  Id. §§ 4-6, 25 Stat. at 643-45.  Section 7 created an interest-bearing account to receive the proceeds from the sale of lands as a permanent fund "to the credit of all the Chippewa Indians in the State of Minnesota."  Accumulated interest would be used to benefit the Chippewa for fifty years, after which the fund would be paid to all Chippewa and their living descendants in equal shares.  Id. § 7, 25 Stat. at 645.

After enactment, a three-member Commission that included Senator Rice conducted negotiations at the Reservation, proffering a Nelson Act Agreement. Referring to the 1863 Treaty, Senator Rice told the Mille Lacs delegates the proffered Agreement "is the acknowledgment of the Government that . . . you have not forfeited your right to occupy the reservation. . . . [A]cceptance of [the Nelson Act] . . . leaves you in a stronger position than before," and confirmed the Band would receive allotments at Mille Lacs if they agreed to the Act. H.R. Exec Doc. No. 51-247, at 164-65 (1890). The Band signed the Agreement. It provided that the Band would "accept and consent to . . . each and all of the provisions" of the Nelson Act, and agrees to "hereby forever relinquish to the United States the right of occupancy on the Mille Lac Reservation, reserved to us by the twelfth article of the [1864 Treaty]." Id. at 45-46.

**F. The 1902 Act and Agreement.** Subsequent events frustrated the Band's ability to take allotments at Mille Lacs. Settlers poured in, claiming Reservation lands. Secretary of the Interior John Noble lifted the stay on disposal of Reservation lands, noting that the Band's interest was not a "reservation" upon which Band members could take allotments. See Amanda J. Walters, 12 Pub. Lands Dec. 52, 55-56 (1891). Secretary Noble ruled that the Reservation was not a "technical Indian reservation" -- the Article 12 proviso gave the Band "the right to the use and occupancy [of the Reservation] for an indefinite period of time," but the lands were "not free from claims or rights." N. Pac. R.R. Co., 13 Pub. Lands Dec. 230, 234 (1891). Secretary Noble also ruled that Reservation lands were to be disposed of under the Nelson Act, not the general land laws. Mille Lacs Lands, 14 Pub. Lands Dec. 497, 497-98 (1892). The General Land Office cancelled entries made under the general land laws. See H.R. Rep. No. 52-2321, at 2 (1893).

In 1893, Congress passed a joint resolution protecting entries made on 31,659 acres of the 61,000 total acres "within the *former Mille Lacs Reservation* in Minnesota." J. Res. 5, 53rd Cong., 28 Stat. 576 (1893) (emphasis added). The

Commissioner of the General Land Office opined to Congress that available land at Mille Lacs "is insufficient in quantity and unfit in quality for the purpose of allotment." S. Rep. No. 55-1007, at 3 (1898). A Joint Resolution provided that "all public lands formerly within the Mille Lac Indian Reservation, in the State of Minnesota, be, and the same are hereby, declared to be subject to entry by any bona fide qualified settler under the pubic land laws of the United States." J. Res. 40, 55th Cong., 30 Stat. 745 (1898).

The Band continued to resist inducements to leave Mille Lacs for White Earth. In a March 1900 letter to the Secretary of the Interior, the Band complained that violations of the 1863 and 1864 Treaties were preventing them from taking allotments at Mille Lacs and asked the government to fulfill the Nelson Act Agreement. Instead, in 1902, Congress passed a law directly inducing the Band to remove to White Earth:

> For payment to the Indians occupying the Mille Lac Indian Reservation . . . the sum of forty thousand dollars, or so much thereof as may be necessary, to pay said Indians for improvements made by them, or any of them, upon lands occupied by them on said Mille Lac Indian Reservation . . . upon condition of said Indians removing from said Mille Lac Reservation: *Provided*, That any Indian who has leased or purchased any Government subdivision of land within said Mille Lac Reservation . . . shall not be required to move from said reservation . . . *And provided further*, That this appropriation shall be paid only after said Indians shall, by proper council proceedings, have accepted the provisions hereof . . . and said Indians upon removing from said Mille Lac Reservation shall be permitted to take up their residence and obtain allotments in severalty either on the White Earth Reservation or on any of the ceded Indian reservations in the State of Minnesota on which allotments are made to Indians.

Act of May 27, 1902, ch. 888, § 1, 32 Stat. 245, 268.

-27-

At a meeting to obtain the Band's consent, government representatives told the Band, "[b]ear in mind that you have lost all rights to lands here, you have no rights to lands here now, and you can acquire none here, but you can acquire rights elsewhere under the present legislation." They said the 1902 Act contemplated removal in exchange for payment; the Band would lose "no rights by moving." Band members could choose to purchase land on the Reservation if they became dissatisfied with White Earth. The Band signed the proffered agreement, consenting to the 1902 Act:

> NOW THEREFORE, IN CONSIDERATION of the covenants and agreements of the party of [the United States] herein contained, the said Mille Lac Indians occupying the former Mille Lac Indian Reservation, parties of the second part, hereby accept the appraisement made . . . of even date herewith, aggregating Forty thousand dollars, ($40,000), as full compensation for improvements made by them, or any of them, upon lands occupied by them, on said Mille Lac Reservation, and also accept the terms and conditions of said Act of Congress and agree to remove from said Mille Lac Indian Reservation . . . [when] notified by the proper authorities that the necessary arrangements have been made for them upon the White Earth Reservation or any of the ceded Indian Reservations in the state of Minnesota on which allotments are made to Indians . . . .

> It is understood that nothing in this agreement shall be construed to deprive the said Mille Lacs Indians of any benefits to which they may be entitled under existing treaties or agreements not inconsistent with the provisions of this agreement, or the [Act of 1902].

Minutes of Council of the Mille Lacs Indians at Mille Lacs (Aug. 30, 1902).

Many Band members then left the Reservation, but 200-300 remained at all times, and some who left later returned. Band members received long-awaited allotments on the Reservation after Congress purchased lands in 1914, 1923, and

1934.[12]   Today, the United States owns approximately 3,600 acres within the Reservation's 1855 boundaries in trust for the Band.  The Band and individual members own about 6,100 acres in fee.

**G. Two Relevant Supreme Court Opinions.**  1. The Act of Feb. 15, 1909, ch. 126, 35 Stat. 619, gave the Court of Claims "jurisdiction to hear and determine a suit or suits . . . by and on behalf of the Mille Lac Band . . . against the United States on account of losses sustained . . . by reason of the opening of the Mille Lac Reservation . . . to public settlement under the general land laws of the United States," and to award money damages if the Band prevailed.  The Band sued, arguing the government failed to carry out the Nelson Act when it opened the Reservation under the public land laws instead of disposing of the land as the Nelson Act required.  Construing the Article 12 treaty proviso, the Court of Claims concluded it did not grant the Band "a mere license or favor," as the Secretary of the Interior had concluded.  Rather, promising "they shall not be compelled to remove" granted the Band a right to remain on the Reservation lands and "confirmed rather than extinguished their rights under the treaty of 1855." Mille Lac Band of Chippewas v. United States, 47 Ct. Cl. 415, 438, 443 (1912).  The Court of Claims awarded damages for lands disposed of contrary to the Nelson Act.  See id. at 461-62.

The United States appealed.  The Supreme Court reversed and remanded. United States v. Mille Lac Band of Chippewa Indians, 229 U.S. 498, 510 (1913) ("MLB").  The Court explained that the 1855 Treaty reserved a tract of land for the Band's use and occupancy.  By the 1863 Treaty, the six reserved tracts "were expressly ceded to the United States (art.1), and one large tract of other lands in Minnesota was reserved for the future home of [the Band]"; in the 1864 Treaty, "provision was made for the payment of large annuities to the Indians in

---

[12]See Act of Aug. 1, 1914, ch. 222, § 8, 38 Stat. 582, 590-92; Act of Jan. 24, 1923, 42 Stat. 1174, 1190-91; Indian Reorganization Act of 1934, 48 Stat. at 984.

consideration for the session of the six original reservations, and it is not questioned that these annuities were duly paid." Id. at 500-01. A controversy arose whether the proviso to Article 12 reserved the lands for the Band's use and occupancy so they could not be opened to settlement while the Band complied. The Nelson Act provided that a commission would negotiate for "the cession and relinquishment of all their reservations, excepting the White Earth and Red Lake Reservations," and the receipt of allotments which an Indian could take "on the reservation where he lives . . . instead of being removed." The Band signed an agreement approved by the President in 1890 that "contained an express assent to all the provisions of the [Nelson Act], and an express relinquishment of the lands in the Mille Lac Reservation." The President in transmitting the approved Agreement to Congress, stated he was "satisfied . . . that the cession and relinquishment by said Chippewa Indians of their title and interest in the lands specified . . . was obtained in the manner prescribed in . . . said act." The Band signed the agreement "accept[ing]" the Nelson Act and "forever relinquish[ing] to the United States the right of occupancy on the Mille Lac Reservation, reserved to us by the twelfth article of the treaty of May 7, 1864." Id. at 502-05.

The Court further explained that Reservation lands remaining after allotment were disposed of under the general land laws, creating "a real controversy between the Mille Lacs and the government . . . that . . . was still subsisting when the [Nelson Act] was passed by Congress and assented to by the Indians." In the Nelson Act, "the controversy was adjusted and composed by concessions on both sides, whereby the lands in the Mille Lac Reservation were put in the same category . . . as the lands in the other reservations relinquished under the act." The Act authorized "the issuing of patents on, all existing pre-emption and homestead entries" protected by a proviso to § 6 of the Nelson Act. MLB, at 506-09. However,

> other lands in that tract . . . were to be disposed of . . . for the benefit of
> the Indians, in like manner as were the ceded lands in the other

-30-

reservations . . . . not to the United States absolutely, but in trust. It was a cession of all the unallotted lands. The trust was to be executed by the sale of the ceded lands and a deposit of the proceeds in the Treasury of the United States, to the credit of the Indians, such sum to draw interest at 5 per cent.

. . . [L]ands not within the proviso were disposed of, not under the [Nelson Act], but under the general land laws; not for the benefit of the Indians, but in disregard of their rights. . . . [T]he Indians are entitled to recover for the resulting loss.

Id. at 509.

2. In United States v. Minnesota, 270 U.S. 181 (1926), the United States sued the State of Minnesota to cancel swamp land patents issued to the State between 1871 and 1912. The United States argued that, by prior treaties with the Chippewa, "the lands were appropriated or set apart for the Chippewas . . . those obligations are still existing and must be performed, and that to enable the United States to proceed with . . . performance it is entitled to a cancellation of the patents [on] lands as still are held by the state." Id. at 192-93. In rejecting this claim and ruling in favor of the State, the Supreme Court again explained the relevant Reservation history in detail:

By a treaty made in 1863 six of the [1855 Treaty] reservations, including the Mille Lac . . . were ceded to the United States, and a large reservation . . . was set apart as 'future homes' for the Indians then on the ceded reservations. The twelfth article of that treaty declared that the Indians were not obligated to remove . . . until certain stipulations . . . were complied with . . . . The United States complied with the stipulations and most of the Indians on the ceded reservations other than the Mille Lac removed . . . .

. . . .

-31-

> . . . A treaty negotiated in 1864 . . . enlarged the large reservation set apart in 1863. By a treaty made in 1867 the greater part of the large reservation set apart in 1863 and enlarged in 1865 was ceded to the United States . . . .
>
> Under the [Nelson Act], the Chippewas ceded and relinquished to the United States all of their reservations, here described . . . .
>
> The Mille Lac reservation, although included in the cession of 1863, was again included in the cession under the [Nelson Act]. . . . [which] . . . adjusted and composed [the controversy "over the meaning and effect" of the proviso in Article 12 of the 1864 Treaty].

Id. at 197-98 (citations omitted). The Court ruled in favor of the State because, on remand from its decision in MLB, the Court of Claims determined that the United States did not owe damages to the Band for granting a swamp land patent protected by the proviso to § 6 of the Nelson Act. As there was no appeal of that decision, "the United States is without right to any recovery here in respect of the lands as to which it was adjudged there to be free from any obligation or responsibility to the Indians." Id. at 199.

**H. Focusing the Issue.** In Solem, 465 U.S. at 470-71, the Supreme Court held:

> Explicit reference to cession [in a statute or ratified treaty] . . . strongly suggests that Congress meant to divest from the reservation all unallotted opened lands. . . . When such language of cession is buttressed by an unconditional commitment from Congress to compensate the Indian tribe for its opened land, there is an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished [or disestablished].

See Parker, 577 U.S. at 488-89; South Dakota v. Yankton Sioux Tribe, 522 U.S. 329, 345 (1998); DeCoteau, 420 U.S. at 447-48; United States v. Jackson, 697 F.3d 670, 675 (8th Cir. 2012). By contrast, a surplus lands act that "merely opened reservation

land to settlement and provided that the uncertain future proceeds of settler purchases should be applied to the Indians' benefit" does not bear "these hallmarks of diminishment." Parker, 577 U.S. at 489 (quotation omitted).

Here, in the treaties of 1863, 1864, and 1865, and in the agreements in which the Band agreed or consented to the Nelson Act and the 1902 Act, the Band expressly "ceded" the Reservation to the United States in consideration for specific payments of money, goods, and governmental services.[13] "[T]here is only one place we may look: the Acts of Congress" to determine whether a tribe's reservation continues. McGirt, 591 U.S. at 903. Thus, the "almost insurmountable presumption," Solem, 465 U.S. at 470, appears to apply. The district court acknowledged the presumption but then paid it lip service. "In the past," the court dubiously asserted, "when Congress has intended to disestablish a reservation, it generally has forthrightly stated this intention." And here, the district court noted, to the extent that fee title was ceded, the treaties do not specify that the public land laws govern their disposal. This reasoning is inconsistent with the Supreme Court's holding that "[d]isestablishment has never required any particular form of words." McGirt, 591 U.S. at 904.

While acknowledging that the Nelson Act contemplated "complete cession and relinquishment in writing of all their title and interest in an to all the Reservation[]" and that the Band expressly consented to the Act, the district court further reasoned, "the Nelson Act merely provided for the allotment and sale of reservation land, the proceeds to be held in trust for Minnesota's Chippewa."[14] But this ignores the fact that the language of the Nelson Act and Agreement are "precisely suited" to

---

[13]The 1867 Treaty had comparable language in ceding the lands on the Leech Lake Reservation acquired in the 1864 Treaty and acquiring lands in the newly established White Earth Reservation.

[14]Allotment alone does not revoke a reservation. See United States v. Celestine, 215 U.S. 278, 287 (1909).

disestablishment.  Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 597 (1977), quoting DeCoteau, 420 U.S. at 445.  "While the provision for definite payment can certainly provide additional evidence of diminishment, the lack of such a provision does not lead to the contrary conclusion."  Hagen v. Utah, 510 U.S. 399, 412 (1994), citing Rosebud Sioux, 430 U.S. at 596; see United States v. Choctaw Nation & Chickasaw Nation, 179 U.S. 494, 536 (1900).

In the two above-summarized opinions, the Supreme Court repeatedly used language "precisely suited" to disestablishment in describing the effects of the 1863 and 1864 treaties and the Nelson Act on the Reservation established in the 1855 Treaty.  True enough, as the district court emphasized, the decisions in MLB and U.S. v. Minnesota did not hold that the Reservation was disestablished by the 1863 and 1864 Treaties or by the Nelson Act.  That issue was not presented.  But the holdings in these cases -- that the Band was entitled to be paid the consideration it was promised, and that the State had retained its rights under land patents -- were consistent with disestablishment.[15]

Viewing the seemingly clear disestablishment language in those treaties and the Nelson Act, we think the inference that the Supreme Court gave that language its plain meaning, in accordance with the Court's disestablishment decisions prior to 1913 and 1926, is powerful, to say the least.  In Rosebud Sioux, for example, the Rosebud Sioux Indians agreed to "cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted."  The Court held that the tribe's reservation was diminished by the statute in question, despite the fact that the tribe

---

[15]"[O]nce Congress has demonstrated . . . a clear intent to subject the land to taxation by making it alienable, Congress must make an unmistakably clear statement in order to render it nontaxable" to restore federal trust status.  Cass Cnty. v. Leech Lake Band of Chippewa Indians, 524 U.S. 103, 110-14 (1998); see 25 U.S.C. § 465 (transferred to § 5108).

was only to be paid the uncertain proceeds of future sales of the ceded land, rather than an up-front sum certain. 430 U.S. at 596-98.

However, we agree with the district court that these two decisions were not necessarily inconsistent with the Reservation maintaining its prior status, with its 1855 or diminished boundaries. Given this complex history, ambiguities abound. In these circumstances, vacatur is appropriate so this longstanding Indian country issue, which presents itself in a variety of specific contexts, can be addressed in a live controversy where it will be subject to appellate review.

## V. Conclusion

For the foregoing reasons, the appeal is dismissed as moot. The case is remanded to the district court with directions to vacate its orders of March 4, 2022 and January 10, 2023, and for further proceedings not inconsistent with this opinion.

ERICKSON, Circuit Judge, concurring specially.

I concur specially in the opinion of the Court. I join in Parts I, II, and III which disposes of the case as moot and orders vacatur of the district court's orders of March 4, 2022, and January 10, 2023. Where I part company with the Court is in Part IV, which I do not join. I appreciate the Court's desire to set forth the factual history that it gleans from the history of the relationship between the Mille Lacs Band of Ojibwe and the United States. This analysis stands in some juxtaposition with the district court's views and accurately represents the differing views of that history. The questions of whether or not the treaties and Nelson Act operated to disestablish the Reservation, with its 1855 boundaries, or whether the subsequent acts of Congress reestablished the reservation, either within its 1855 or other boundaries, remain open to be decided at some future date. I would remain silent on the issue and leave the

-35-

ultimate factual analysis to a subsequent court to wrestle with based on the record that is developed in that future case.

_____